**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

Max Stern Estate,
c/o Mr. Robert Vineberg
Davies Ward Phillips & Vineberg LLP
1501 McGill College Ave.
26th Floor
Montreal, Quebec H3A 3N9
CANADA

Plaintiff,

v.

Maria-Louise Bissonnette,
50 Park Row W
Apt. 905
Providence, RI 02903

and

Estates Unlimited, Inc.,
63 Fourth Ave.
Cranston, RI 02910

Defendants.

Civil Act. No. CA 06 211 ML

**JURY TRIAL DEMANDED**

**PLAINTIFF'S COMPLAINT**

The Max Stern Estate ("Stern Estate"), by its undersigned attorneys, Andrews Kurth LLP and Tillinghast Licht LLP, alleges as follows:

**NATURE OF THE ACTION**

1. This is an action to recover personal property, for declaratory and injunctive relief, and for damages arising from the unlawful detention of a unique artwork consisting of an oil painting on canvas by Franz Xaver Winterhalter entitled "Mädchen aus den Sabiner Bergen" ("Girl from the Sabiner Mountains") (hereinafter the "Painting"), which was taken in Germany from Dr. Max Stern, now deceased, and sold by force under orders of the Reich Chamber for the

Visual Arts in or about 1937. Plaintiff is the Stern Estate, which brings this case to recover possession and control of the Painting, or alternatively, its value. Defendant Maria-Louise Bissonnette ("Bissonnette") claims to be the owner of the Painting, which was on consignment to and in the possession of defendant Estates Unlimited, Inc. ("Estates Unlimited"). Upon discovering that the Painting was in Estates Unlimited's possession, the Stern Estate duly demanded the return of the Painting from Bissonnette and Estates Unlimited. The Stern Estate brings this action on the refusal of this demand.

**PARTIES**

2. Plaintiff Stern Estate is a foreign citizen. Plaintiff Stern Estate is a citizen and domiciliary of Canada.

3. On information and belief, Defendant Bissonnette is a citizen of the State of Rhode Island and a citizen of the United States. Defendant Bissonnette is a domiciliary of the State of Rhode Island, residing at 50 Park Row W, Apartment 905, Providence, Rhode Island.

4. Defendant Estates Unlimited is a corporation incorporated in the State of Rhode Island. Its principal place of business is at 63 Fourth Avenue, Cranston, Rhode Island.

**JURISDICTION AND VENUE**

5. This Court has jurisdiction under 28 U.S.C. § 1332 and 28 U.S.C. § 1367(a).

6. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7. Venue is proper in this district under 28 U.S.C. § 1391(a), since this is the district in which (1) both defendants reside, and (2) a substantial part of the events or omissions giving rise to the claim occurred.

8. In addition, venue is proper in this district under 28 U.S.C. § 1391(a), since the property that is the subject of the action was situated in this district until it was wrongfully

removed to Cologne, Germany. That improper removal was initiated and orchestrated by Defendant Bissonnette, on information and belief with the cooperation and consent of Defendant Estates Unlimited.

## FACTS

### The Galerie Stern

9. In or about 1913, Dr. Max Stern's father Julius Stern opened an art gallery in Düsseldorf, Germany. The Galerie Julius Stern specialized in Dutch and Flemish Old Masters, and in German paintings.

10. Julius Stern passed away in 1934, leaving his gallery to his son Dr. Max Stern, who became the sole owner. Dr. Stern was Jewish and subject to Nazi laws pertaining to Jews. During Dr. Stern's ownership of the gallery, it was known as Galerie Stern.

11. On information and belief, the Painting was painted by Franz Xaver Winterhalter in the nineteenth century, and is entitled "Girl from the Sabiner Mountains."

### The Forced Sale of Stern's Collection

12. When Dr. Stern took ownership of the gallery in 1934, the Nazi government in Germany was beginning to enact and enforce strict and sweeping discriminatory laws that prohibited persons defined under Nazi law as Jews from owning or operating businesses.

13. Starting in 1935, the Reichskammer der bildenden Künste ("Reich Chamber for the Visual Arts"), a subsidiary of the Reichskulturkammer ("Reich Chamber of Culture"), sent letters to Dr. Stern, demanding that he liquidate his inventory and gallery.

14. On or about August 29, 1935, the Reich Chamber for the Visual Arts ordered Dr. Stern to sell or liquidate his inventory and gallery because he was a Jew and, as such, was forbidden to join the Chamber or operate an art gallery.

15. Dr. Stern appealed the decision without success, and on or about September 13, 1937, received the Reich Chamber for the Visual Arts' final irrevocable order to sell his inventory immediately through a dealer approved by the Reich Chamber for the Visual Arts.

16. The Reich Chamber for the Visual Arts gave Dr. Stern until December 15, 1937 to liquidate his inventory and dissolve the gallery. Dr. Stern consigned most of his inventory and private collection to Kunsthaus Lempertz ("Lempertz auction house") in Cologne, Germany.

17. On or about November 13, 1937, the Lempertz auction house sold the works consigned to it by Dr. Stern, including the Painting, in auction No. 392. The sale was entitled "Die Bestände der Galerie Stern - Düsseldorf" ("Inventory of Galerie Stern - Düsseldorf") (hereinafter "Lempertz/Stern Sale").

18. The Lempertz auction house was founded in 1845 and still operates in Cologne. Its website recently included the Lempertz/Stern Sale on its list of "The most Important Sales, Collections and Estates since 1888."

19. Dr. Stern fled Nazi Germany for Paris on or about December 23, 1937, after the forced sale of the inventory of his gallery.

20. The same day Dr. Stern escaped Germany, the Reich Chamber for the Visual Arts wrote a letter to the Gestapo asking it to verify that Dr. Stern was in compliance with its order.

21. In late 1937, a second sale was held of Dr. Stern's paintings remaining at Galerie Stern, as reflected in final catalog No. 9.

22. The Lempertz/Stern Sale of Dr. Stern's business was a forced liquidation, ordered by the Reich Chamber for the Visual Arts, an official organization of the Nazi government of Germany. Many of the works, including the Painting, were sold at well below market value.

23. After leaving Paris, Dr. Stern joined his sister in London, just prior to the outbreak of World War II. Dr. Stern was, for the first part of the War, interned in a refugee camp on the Isle of Man as an "enemy alien."

24. Stern later emigrated to Canada, where he was interned as a "civilian alien." He was released in 1942.

25. After his release, Dr. Stern became a preeminent Canadian art collector and dealer as head of the Dominion Gallery in Montreal. Upon his death in 1987, Dr. Stern bequeathed all residue of his estate to the Dr. and Mrs. Max Stern Foundation ("Foundation").

26. The Foundation primarily benefits three non-profit institutions: Concordia University in Montreal, McGill University in Montreal, and the Hebrew University of Jerusalem in Israel.

**Bissonnette Obtains the Painting**

27. Dr. Karl Wilharm acquired the Painting through the Lempertz/Stern Sale in which Dr. Stern's gallery was forcibly liquidated. Dr. Wilharm was a physician who, during the National Socialist era, was a high-ranking member of the S.A. ("Sturm Abteilung" (Storm Troopers)) and joined the Nazi party in 1932.

28. Dr. Wilharm was Defendant Bissonnette's stepfather.

29. After the War, on July 20, 1945, Dr. Wilharm was arrested by the American occupation forces as a Category 1 offender. He was interned for approximately 15 months due to his previous Nazi affiliations and activities.

30. On information and belief, Bissonnette inherited or otherwise obtained possession of the Painting through Dr. Wilharm and/or Bissonnette's mother Baroness von Morsey Pickard.

**Stern's Efforts to Recover his Collection**

31. After the end of World War II, Stern made efforts to recover his collection. In 1946, he returned to Germany and initiated proceedings that led to the recovery of 14 paintings. He also attempted to recover works from Barclays Bank in England, where he had stored some works during his time there in the late 1930s. In August 1952, he advertised several of his losses in the art magazine "Die Weltkunst" ("Art World"). Most of Stern's collection has not been recovered.

32. Lempertz auction house was heavily damaged in 1943 by wartime bombing, and most of its Nazi-era records were destroyed. Post-War efforts to locate paintings from the Stern auctions were hindered by the near-total destruction of records that might have revealed the identities of purchasers.

33. On or about February 24, 1964, a restitution court in Germany recognized that the Lempertz/Stern Sale was a forced sale. The court also held that all the paintings sold at the Lempertz/Stern Sale were owned by Dr. Stern.

34. The court awarded Dr. Stern partial damages for his loss of profit in being forced to sell his inventory of paintings at prices that were below what he could have charged in the ordinary course of business, known as "Verschleuderungsschaden."

35. The court also noted that although Stern initially received some proceeds from the sales of his inventory and other business assets, the Nazi government forced him to pay excessive income and other discriminatory taxes out of those proceeds. Therefore, Stern took none of the proceeds of the sales out of Germany when he fled.

**Stern Estate's Discovery of the Painting**

36. The Painting is currently in the private collection of Dr. Wilharm's stepdaughter Bissonnette.

37. On information and belief, sometime in 2004, Estates Unlimited received the Painting on consignment from Bissonnette.

38. On or about January 5, 2005, the Stern Estate learned that the Painting was on consignment to Estates Unlimited. The Stern Estate did not know the identity of the purchaser of the Painting at the Lempertz/Stern Sale. The Stern Estate also did not know that the Painting survived the War. The Stern Estate also did not know the location of the Painting.

39. In January 2005, the Stern Estate made a claim for restitution of the Painting with the Holocaust Claims Processing Office in New York ("HCPO"), a division of the State of New York's Banking Department.

40. On or about February 8, 2005, acting on behalf of the Stern Estate, the HCPO sent a demand letter to Bissonnette through Estates Unlimited seeking restitution of the Painting.

41. Bissonnette refused to return the Painting to the Stern Estate as demanded by the HCPO.

42. From February 2005 through April 2006, HCPO and Bissonnette continued a dialogue in an attempt to resolve the Stern Estate's restitution claim.

43. On or about April 19, 2006, the Stern Estate learned that the Painting had been removed from this district and the United States, and sent to Germany. The Stern Estate has not been served with process in that proceeding. Neither Bissonnette nor Estates Unlimited informed the Stern Estate of the plans to remove the Painting from this district and the United States until after the removal was complete.

44. Bissonnette has continued to refuse to return the Painting to the Stern Estate.

45. The Painting is unique and valuable.

46. As a member of the Nazi party when he took possession of the Painting in 1937, purchasing it at the liquidation auction of a Jewish-owned business, Dr. Wilharm knew or should have known that it was being sold under extreme coercion and duress. Dr. Wilharm possessed the Painting in his private collection until he passed it to his wife Baroness von Morsey Pickard or to his stepdaughter Bissonnette.

47. Since acquiring it, Bissonnette has maintained possession of the Painting in her private collection. Except for one small exhibition in Kassel, Germany in June 1952, the Painting has been held solely in private hands since 1937. Thus, the Painting has been fraudulently concealed from the Stern Estate since 1937.

48. The Painting was stolen from the Stern Estate by a forced sale ordered by the Nazi government of Germany, and has been fraudulently concealed from Dr. Stern and his estate since approximately 1937.

## CLAIMS FOR RELIEF

### Count I – Replevin (Bissonnette)

49. The Stern Estate repeats and incorporates by reference the allegations set forth in paragraphs 1 through 48, above.

50. Since Dr. Stern bought the Painting, he and – upon his death – the Stern Estate have been and remain the lawful owners of the Painting, and have superior and exclusive right to immediate possession of the Painting.

51. Bissonnette's refusals to return the Painting were wrongful.

52. The Painting is not exempt from seizure.

53. Bissonnette's continuing possession of the Painting since refusing the Stern Estate's demand is wrongful and without the authority of the true owner, the Stern Estate.

54. Bissonnette's wrongful refusal to return the Painting and her continuing possession of and exercise of control over the Painting have caused damage to the Stern Estate by depriving it and its beneficiaries of the use and enjoyment of the Painting.

55. Because the Painting is a unique work of art, the harm to the Stern Estate and its beneficiaries cannot be adequately remedied unless the Painting is returned to them, with damages for loss of use and enjoyment during the period of Bissonnette's wrongful detention of the Painting.

56. Bissonnette's failure to return the Painting violates R.I. Gen. Laws § 34-21-1 *et seq.* (1995).

57. Because the Stern Estate is the true owner of and has a right of immediate possession of the Painting, and because Bissonnette has no lawful basis for a claim to ownership or right to possession, the Painting must be returned to the Stern Estate.

**Count II – Declaratory Judgment**
**(Bissonnette)**

58. The Stern Estate repeats and incorporates by reference the allegations set forth in paragraphs 1 through 57, above.

59. There is an actual controversy between the parties concerning ownership, title to and right to possession of movable property, namely the Painting.

60. The Stern Estate is entitled to a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that it is the true owner of the Painting, and has superior title and exclusive right to immediate possession of the Painting.

**Count III – Trespass to Chattels**
**(Bissonnette and Estates Unlimited)**

61. The Stern Estate repeats and incorporates by reference the allegations set forth in paragraphs 1 through 60, above.

62. Bissonnette and Estates Unlimited have dispossessed Stern Estate of the Painting.

63. Bissonnette and Estates Unlimited used and/or are using the Painting, and interfered and/or are interfering with the possessory rights of the proper owner of the Painting, the Stern Estate.

64. Bissonnette intentionally dispossessed the Stern Estate of the Painting.

65. Bissonnette and Estates Unlimited are liable to the Stern Estate, the entity which has been entitled to immediate possession of the Painting.

66. The Stern Estate, which is and has been entitled to immediate possession, has, along with its predecessor-in-interest Dr. Stern, been deprived of the use of the Painting for a substantial time, since approximately 1937.

67. Bissonnette dispossessed the Stern Estate of the Painting by assuming dominion and control over it with the intention of exercising that control for her own benefit. Bissonnette's exercise of dominion and control over the Painting has been and is inconsistent with the Stern Estate's right to possession and control.

68. Estates Unlimited dispossessed the Stern Estate of the Painting by assuming dominion and control over it with the intention of exercising that control for Bissonnette's benefit and its own. Estates Unlimited's former exercise of dominion and control over the Painting was inconsistent with the Stern Estate's right to possession and control.

69. Bissonnette's and Estates Unlimited's dispossession from Dr. Stern and the Stern Estate has interfered with the Stern Estate's right to control the Painting.

70. The Stern Estate is entitled to damages for loss of the use of the Painting.

71. The Stern Estate is entitled to damages for Bissonnette's and Estates Unlimited's detention of the Painting and for any harm to the Painting they caused.

**Count IV – Civil Liability for Crime (R.I. Gen. Laws § 9-1-2)**
**(Bissonnette and Estates Unlimited)**

72. The Stern Estate repeats and incorporates by reference the allegations set forth in paragraphs 1 through 71, above.

73. Bissonnette, on information and belief with the assistance of Estates Unlimited, transferred the Painting out of Rhode Island to another State for international shipping.

74. On information and belief, Bissonnette authorized and arranged for the Painting, which is of the value of $5,000 or more, to be shipped out of Rhode Island and out of the United States.

75. On information and belief, Estates Unlimited cooperated with Bissonnette and assisted her in shipping the Painting out of Rhode Island and out of the United States.

76. The Painting is currently in the possession of Bissonnette's counsel or other agent in Germany.

77. Bissonnette transported, transmitted, or transferred the Painting in both interstate and foreign commerce, knowing that the Painting was stolen, converted, or taken by fraud.

78. Bissonnette received and possessed the Painting, which crossed a State boundary and a United States boundary after being stolen, unlawfully converted, or taken by fraud.

79. Bissonnette knew the Painting to have been stolen, unlawfully converted, or taken when she received and possessed it.

80. Bissonnette's actions violate 18 U.S.C. §§ 2314 and 2315, the National Stolen Property Act.

81. The Stern Estate has suffered injury as a direct and proximate result of Bissonnette's violations of the National Stolen Property Act because those violations removed the Painting, which is subject to a restitution claim by the Stern Estate, from this district and the United States, and prevented the Stern Estate from exercising its right to possession, control and use of the Painting.

82. Bissonnette knowingly received and possessed stolen goods in violation of R.I. Gen. Laws § 11-41-2, Receiving Stolen Goods.

83. Pursuant to R.I. Gen. Laws § 9-1-2, the Stern Estate is entitled to civil damages for Bissonnette's violations of 18 U.S.C. §§ 2314 and 2315 and R.I. Gen. Laws § 11-41-2, which she violated as described above.

**Count V – Alternative Count: Conversion**
**(Bissonnette and Estates Unlimited)**

84. The Stern Estate repeats and incorporates by reference the allegations set forth in paragraphs 1 through 83, above.

85. As an alternative to Count I, the Stern Estate seeks damages for Bissonnette's and Estates Unlimited's conversion of the Painting.

86. Bissonnette and Estates Unlimited converted the Painting by failing to return the Painting to the Stern Estate, which has been and continues to be the lawful owner of the Painting and entitled to exclusive possession of it.

87. Since in or about 1937, the time of the conversion of the Painting, Dr. Stern and later the Stern Estate have been and continue to be the lawful owners of the Painting and entitled to exclusive possession of it.

88. Since being informed of the Stern Estate's claim, Bissonnette, on information and belief with the cooperation of Estates Unlimited, has intentionally taken and exercised dominion

and control over the Painting to the exclusion of and inconsistent with the Stern Estate's legal rights in and to the Painting, and without the Stern Estate's permission.

89. Bissonnette, on information and belief with the cooperation and assistance of Estates Unlimited, intentionally exercised dominion and control over the Painting by refusing to return the Painting to the Stern Estate upon demand and continuing to possess it thereafter, including removing the Painting from the jurisdiction.

90. Bissonnette's intentional exercise of dominion and control over the Painting has been wrongful and without the authority of the true owner, the Stern Estate.

91. Bissonnette appropriated the Painting to her own use without the Stern Estate's permission and without legal right.

92. Bissonnette's refusal to return the Painting upon the Stern Estate's demand is wrongful.

93. The Stern Estate is entitled to damages for Bissonnette's and Estates Unlimited's conversion of the Painting.

94. The Painting was converted knowingly, willfully and in bad faith, warranting the award of punitive damages.

95. In the event the Painting has been impaired in any way in its condition, quality, or value since it was acquired by or in the possession of Bissonnette, or in the possession of Estates Unlimited, or cannot be returned for any reason, the Stern Estate is entitled to be compensated for such damage or loss.

**PRAYER FOR RELIEF**

WHEREFORE, the Stern Estate prays that this Court will take the following actions and grant the following relief:

a. enter an order requiring defendant Bissonnette to return the Painting to the jurisdiction of the Court;

b. enter an order enjoining defendant Bissonnette from selling or otherwise disposing of or moving the Painting other than to return it to this jurisdiction;

c. declare the Stern Estate to be the true owner of the Painting with superior title and immediate right to exclusive possession of the Painting;

d. award the Stern Estate exclusive possession of the Painting and direct defendant Bissonnette to turn the Painting over to the Stern Estate;

e. award the Stern Estate its actual damages from Bissonnette and Estates Unlimited, in an amount to be determined at trial, to compensate the Stern Estate for loss of use of the Painting, and as compensation for any damage to the Painting while it was in Bissonnette's and Estates Unlimited's possession or control;

f. award the Stern Estate punitive damages from Bissonnette and Estates Unlimited, in an amount to be determined at trial, to compensate the Stern Estate for the intentional and bad faith conversion of the Painting;

g. upon final judgment, award the Stern Estate pre-judgment and post-judgment interest on any damages awarded from Bissonnette and Estates Unlimited as allowed by law;

h. award the Stern Estate its costs of court, expenses and reasonable attorneys' fees; and

i. award the Stern Estate such other and further relief to which it may be entitled at law or in equity.

*Of Counsel:*
ANDREWS KURTH LLP
Thomas R. Kline
thomaskline@andrewskurth.com
L. Eden Burgess
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

Date: May 8, 2006

TILLINGHAST LICHT LLP
Glenn R. Friedemann (R.I. Bar No. 3051)
gfriedemann@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

*Counsel for Plaintiff Max Stern Estate*