**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Stern Estate, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Act. No. 06-211 (ML)** |
| | § | |
| Maria-Louise Bissonnette, *et al.* | § | |
| | § | |
| Defendants. | § | |
| | § | |

**STERN ESTATE'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, the Dr. and Mrs. Stern Foundation ("Stern Estate"), through its trustees, hereby submits its Motion for Summary Judgment on its replevin and conversion claims against Defendant Maria-Louise Bissonnette ("Defendant" or "Bissonnette") concerning Franz Xaver Winterhalter's "*Mädchen aus den Sabiner Bergen*" ("Girl from the Sabiner Mountains") (the "Painting").[1]

As demonstrated in the Memorandum of Law in Support of Stern Estate's Motion for Summary Judgment and the other documents relied on in connection with this Motion, no material facts are in dispute concerning ownership and right to immediate possession of the Painting, and Stern Estate is entitled to judgment on its replevin and conversion claims and to an order awarding Stern Estate return of the Painting or, if the painting cannot be returned or has been damaged, the value lost. Since the Painting is available for return and under the control of Defendant, Stern Estate asks that Bissonnette be ordered to turn over possession of the Painting forthwith.

[1] Stern Estate also respectfully requests that the Court substitute Robert S. Vineberg, Michael D. Vineberg and Sydney Feldhammer, each of whom is a trustee of the Dr. and Mrs. Stern Foundation, acting on behalf of Stern Estate, as the named Plaintiffs in this proceeding.

In support of this Motion, Stern Estate submits herewith its Memorandum of Law in Support of Stern Estate's Motion for Summary Judgment, Stern Estate's Statement of Undisputed Facts in Support of Its Motion for Summary Judgment; Declaration of Robert S. Vineberg in Support of Stern Estate's Motion for Summary Judgment, and exhibits attached thereto; Declaration of Thomas R. Kline in Support of Stern Estate's Motion for Summary Judgment, and exhibits attached thereto; Declaration and Expert Report of German lawyer Dr. Ulf Bischof of the Berlin law firm of Bischof & Paetow dated June 8, 2007, and exhibits attached thereto; and Affidavit of Steven Fusco dated June 12, 2007, and exhibits attached thereto.

Stern Estate relies, as well, on the previously filed: Declaration and Expert Report of Lynn H. Nicholas dated Dec. 28, 2006; Declaration of Dr. Ulf Bischof dated Dec. 13, 2006; Declaration of Anna B. Rubin, Deputy Director of the New York State Banking Department's Holocaust Claims Processing Office dated Dec. 15, 2006, and exhibits attached thereto; Defendant Maria-Louise Bissonnette's Affidavit in Support of her 12(b) Motion to Dismiss And/Or for Stay dated Dec. 28, 2006; and Defendant Maria Louise Bissonnette's Affidavit as to pending suit in Cologne, Germany dated January 8, 2007, and exhibit attached thereto. These documents demonstrate, beyond dispute, that the Painting was stolen from Dr. Stern, Stern Estate's predecessor-in-interest, by Nazi authorities through a forced sale in 1937 that was ordered as part of Nazi Germany's official persecution of its Jewish minority population, and that the Painting remains the property of the Stern Estate.

WHEREFORE, Stern Estate moves that its Motion be GRANTED.

Dated: June 18, 2007

*/s/ Thomas R. Kline*_______________
ANDREWS KURTH LLP
Thomas R. Kline (admitted *pro hac vice*)
thomaskline@andrewskurth.com
L. Eden Burgess (admitted *pro hac vice*)
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

*/s/ Samuel D. Zurier* _____________
TILLINGHAST LICHT LLP
Samuel D. Zurier (R.I. Bar No. 3576)
szurier@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

**CERTIFICATE OF SERVICE**

I the undersigned hereby certify that on June 18, 2007, the foregoing was served by first-class U.S. mail, postage prepaid, and by certified mail on:

Maria-Louise Bissonnette
59 Park Row W
Apt. 905
Providence, RI 02903

____*/s/ Miranda Perkins*___

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Stern Estate, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Act. No. 06-211 (ML)** |
| | § | |
| Maria-Louise Bissonnette, *et al.* | § | |
| | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**STERN ESTATE'S MOTION FOR SUMMARY JUDGMENT**

ANDREWS KURTH LLP
Thomas R. Kline (admitted *pro hac vice*)
thomaskline@andrewskurth.com
L. Eden Burgess (admitted *pro hac vice*)
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

TILLINGHAST LICHT LLP
Samuel D. Zurier (R.I. Bar No. 3576)
szurier@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

Dated: June 18, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

FACTUAL BACKGROUND .......... 1

LEGAL STANDARD FOR SUMMARY JUDGMENT .......... 8

ARGUMENT .......... 8

I. PARTIES, JURISDICTION AND VENUE. .......... 8

II. RHODE ISLAND LAW GOVERNS PLAINTIFF'S REPLEVIN AND CONVERSION CLAIMS. .......... 10

A. The Injury Occurred In Rhode Island. .......... 11

B. The Most Significant Conduct Causing The Injury Occurred In Rhode Island. .......... 12

C. Bissonnette Is A United States Citizen Domiciled In Rhode Island. .......... 12

D. There Was No Prior Relationship Between The Parties To This Proceeding. .......... 12

E. The Qualitative Nature Of Contacts Indicates That Rhode Island Law Applies. .......... 12

III. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS REPLEVIN AND CONVERSION CLAIMS. .......... 14

A. The Stern Estate Is The Owner Of The Painting. .......... 15

B. The Painting Was Stolen From Stern Estate's Predecessor-in-Interest. .......... 15

C. Defendant Refused Plaintiff's Demand That The Painting Be Returned. .......... 18

D. Having Had Its Demand Refused, Stern Estate Is Entitled To Immediate Possession, Since The Painting Is In Bissonnette's Wrongful Possession. .......... 18

IV. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON BISSONNETTE'S STATUTE OF LIMITATIONS AND LACHES DEFENSES. .......... 19

A. Stern Estate's Replevin And Conversion Claims Are Timely Under Rhode Island's Statute Of Limitations. .......... 19

B. Lacking Prejudice, Bissonnette Cannot Prevail On A Laches Defense .......... 22

V. STERN ESTATE IS ENTITLED TO SUMMARY JUDGMENT ON BISSONNETTE'S *RES JUDICATA* AND COLLATERAL ESTOPPEL DEFENSES. .......... 24



WAS:125464.6

CONCLUSION....................................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Adam v. Adam*, 624 A.2d 1093 (R.I. 1993) ....................22

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................8

*Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc. Church of Cyprus*, *717* F. Supp. 1374 (S.D. Ind. 1989) ....................4, 16, 17

*Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc. Church of Cyprus*, 917 F.2d 278 (7th Cir. 1990) ....................13

*Barbour v. Dynamics Research Corp.*, 63 F.3d 32 (1st Cir. 1995) ....................8

*Blais v. Aetna Casualty & Surety Co.*, 526 A.2d 854 (R.I. 1987) ....................10

*Breneman v. United States ex rel. FAA*, 381 F.3d 33 (1st Cir. 2004) ....................24

*Brown v. Church of the Holy Name*, 252 A.2d 176 (R.I. 1969) ....................11, 12, 13

*Brunswick Corp. v. Modern Pool Parlor*, 389 A.2d 1251 (R.I. 1978) ....................14

*Claflin v. Gurney*, 20 A. 932 (1890) ....................14, 20, 22

*Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1 (1st Cir. 1994) ....................10

*Erisoty v. Rizik*, No. 93-6215, 1995 U.S. Dist. LEXIS 2096 (E.D. Pa. Feb. 23, 1995) ....................25

*Fuscellaro v. Industrial National Corp.*, 368 A.2d 1227 (R.I. 1977) ....................14, 19, 20, 21

*Goldberg v. Lancellotti*, 503 A.2d 1129 (R.I. 1986) ....................20

*Gordon v. Clifford Metal Sales Co.*, 602 A.2d 535 (R.I. 1992) ....................10

*Harley-Davidson, Inc. v. Estate of O'Connell*, 13 F. Supp. 2d 271 (N.D.N.Y. 1998) ....................24

*Houle v. Collatos*, No. 77-1295, 1982 U.S. Dist. LEXIS 10693 (D. Mass. Feb. 2, 1982) ....................22

*Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487 (1941) ....................10

*Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829 (E.D.N.Y. 1981) ....................13, 20

*Menzel v. List*, 267 N.Y.S.2d 804 (N.Y. Sup. Ct. 1966) ....................16, 17, 18

*Moore v. Ballard*, 914 A.2d 487 (R.I. 2007) ....................9



WAS:125464.6

*Moron-Barradas v. Department of Education of*, P.R., No. 06-1456, 2007 U.S. App. LEXIS 12107 (1st Cir. May 24, 2007)....................24

*Narragansett Electric Co. v. Carbone*, 898 A.2d 87 (R.I. 2006)....................14, 21

*Pardey v. Boulevard Billiard Club*, 518 A.2d 1349 (R.I. 1986)....................10

*Solomon R. Guggenheim Foundation v. Lubell*, 569 N.E.2d 426 (N.Y. 1991)....................13, 20, 22

*Spielman v. Genzyme Corp.*, 251 F.3d 1 (1st Cir. 2001)....................10

*St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938)....................10

*Terrien v. Joseph*, 53 A.2d 923 (R.I. 1947)....................11, 20

*Waters v. Walt Disney World Co.*, 237 F. Supp. 2d 162 (D.R.I. 2002)....................10

**OTHER AUTHORITIES**

28 U.S.C. § 1332(a)(2)....................9

28 U.S.C. § 1391(a)....................9

Fed. R. Civ. P. 56....................1, 8

H.A. Smith, *Booty of War*, 23 Brit. Yb. Int'l. L. 227 (Oxford 1946)....................17

Pursuant to Fed. R. Civ. P. 56 and the rules of this Court, the Dr. and Mrs. Stern Foundation ("Stern Estate"), through its trustees, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment on its replevin and conversion claims against defendant Maria-Louise Bissonnette ("Defendant" or "Bissonnette"),[1] and its request that this Court substitute in Robert S. Vineberg, Michael D. Vineberg and Sydney Feldhammer, each of whom is a trustee ("Trustees") of Stern Estate, acting on behalf of Stern Estate, as the named Plaintiffs in this proceeding and, in support of its motion, states as follows:

## PRELIMINARY STATEMENT

This case concerns ownership and right to immediate possession of a nineteenth century painting by Franz Xaver Winterhalter "*Mädchen aus den Sabiner Bergen*" ("Girl from the Sabiner Mountains") (the "Painting"). *Plaintiff's Complaint*, dated May 8, 2006 ("Compl.") ¶ 11; *Answer to Complaint by Maria-Louise Bissonnette* ("Bissonnette Ans.") ¶ 11. Nazi authorities ordered Dr. Stern, Stern Estate's predecessor-in-interest, to sell the Painting at a forced sale where Dr. Karl Wilharm, Defendant's predecessor-in-interest, acquired it. The forced sale being the equivalent of a theft, title never transferred, making Stern Estate the current owner with title and superior right to possession. The facts material to Stern Estate's replevin and conversion claims being undisputed, Stern Estate is entitled to summary judgment.

## FACTUAL BACKGROUND

Before Nazi authorities intervened, the Painting was the property of Dr. Stern, an art dealer in Düsseldorf, Germany. *Lempertz catalogue for auction No. 392, entitled "Die Bestände der Galerie Stern - Düsseldorf"* [Inventory of Galerie Stern - Düsseldorf] ("Stern Catalogue") at SE00451, SE00472 (*Declaration of Robert S. Vineberg*, June 18, 2007 ("Vineberg Dec.") Ex. 4).

---

[1] The Court's Order of June 15, 2007 dismissed Estates Unlimited, Inc. as a defendant.

Galerie Stern was opened in or about 1913 by Dr. Stern's father Julius Stern, who passed away in 1934, leaving the gallery to his son, who became the sole owner. *See Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00279.

In 1935, Nazi Germany enacted the infamous Nuremburg Laws which disqualified Jews from holding German citizenship and subjected Jews, like Dr. Stern, to official persecution on the basis of their religion.[2] Starting that year, the Reichskammer der bildenden Künste ("Reich Chamber of Fine Arts"), a subsidiary of the Reichskulturkammer ("Reich Chamber of Culture") and an official organization of the Nazi government of Germany, sent letters to Dr. Stern, barring him from membership in the Chamber and demanding that he liquidate his inventory and gallery. *Letter from Reichskammer der bildenden Künste to Stern*, Aug. 29, 1935 (*Vineberg Dec.* Ex. 5); *Declaration and Expert Report of Lynn H. Nicholas*, dated Dec. 28, 2006 ("Nicholas Rpt.") ¶ 6. Dr. Stern "was refused membership in the Reich Chamber of Fine Arts on August 29, 1935 on grounds that he did not 'possess the necessary qualities or reliability to promote German culture properly for the German people and nation' a euphemism to indicate he was Jewish." *Nicholas Rpt.* ¶ 6. After two years of opposing the order to liquidate his property, on or about September 13, 1937, Dr. Stern received the Reich Chamber of Fine Art's final irrevocable order to sell his inventory through a dealer approved by the Chamber, the order giving Dr. Stern until December 15, 1937 to liquidate his inventory and dissolve the gallery. *Letter from Chamber to Stern*, Sept. 13, 1937 (*Vineberg Dec.* Ex. 6); *Nicholas Rpt.* ¶ 6.

---

[2] "A Jew cannot be a citizen of the Reich." *The Nuremberg Laws on Citizenship and Race: September 15, 1935*, Art. 4.(1) (downloaded from http://www.mtsu.edu/~baustin/nurmlaw2.html on June 14, 2007) (*Declaration of Thomas R. Kline in Support of Stern Estate's Motion for Summary Judgment* Ex. 7 ("Kline S.J. Dec.")). "Only [a] citizen of the Reich may enjoy full political rights in consonance with the provisions of the laws." *Id. First Supplementary Decree of November 14, 1935*, Article 2.(3) (*Kline S.J. Dec.* Ex. 7).

In response to this final order, Dr. Stern consigned most of his inventory and private collection to Kunsthaus Lempertz ("Lempertz auction house") in Cologne, Germany (*Stern Catalogue* at SE00451, SE00472 (*Vineberg Dec.* Ex. 4); *Excerpt from Lempertz website* (*Kline S.J. Dec.* Ex. 2), at SE00856 (listing Galerie Stern, Düsseldorf as an auction conducted by Lempertz in 1937)), including the Painting (*Stern Catalogue* (*Vineberg Dec.* Ex. 4)). On or about November 13, 1937, the Lempertz auction house sold the works consigned to it by Dr. Stern, including the Painting, in auction No. 392. The sale was entitled "Die Bestände der Galerie Stern - Düsseldorf" ("Inventory of Galerie Stern - Düsseldorf") (hereinafter "Lempertz/Stern Sale"). *Compl.* ¶ 17; *Bissonnette Ans.* ¶ 17; *Stern Catalogue* (*Vineberg Dec.* Ex. 4); *Defendant Maria-Louise Bissonette's* [sic] *Affidavit in Support of Her 12(b) Motion to Dismiss and/or for Stay* ("Bissonnette's First 12(b) Aff.") ¶ 4; *Legal Action* at 3, attachment to *Defendant Maria-Louise Bissonnette's Affidavit as to Pending Suit in Cologne, Germany* ("Bissonnette's Second 12(b) Aff."). Dr. Stern was prohibited from taking the proceeds of the sales out of Germany. *Order*, Jan. 26, 1938 (*Vineberg Dec.* Ex. 11) (order freezing Stern's assets); *Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00280; *Nicholas Rpt.* ¶ 7. Having reviewed the record of the Reich Chamber for the Fine Arts' persecution of Dr. Stern, Nicholas – the leading expert on Nazi art looting – concluded, "Stern's experience is a textbook example of the implementation of the Nazi anti-Jewish policies and of their method of confiscation of Jewish assets." *Nicholas Rpt.* ¶ 5.

Defendant's stepfather Dr. Karl Wilharm purchased the Painting at that auction. *Receipt from Lempertz auction house* (*Affidavit of Steven Fusco*, June 12, 2007 ("Fusco Aff.") ¶ 3 & Ex. D); *Bissonnette's First 12(B) Aff.* ¶ 4.

On or about December 23, 1937, soon after his inventory and private collection were auctioned, Dr. Stern fled Nazi Germany for Paris. *Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00279; *Nicholas Rpt.* ¶ 7. At about the same time, the Chamber asked the Gestapo to verify that Dr. Stern had complied with its liquidation order. *Letter from Chamber to Gestapo*, dated Dec. 23, 1937 (*Vineberg Dec.* Ex. 7). After leaving Paris, Dr. Stern joined his sister in London, just prior to the outbreak of World War II. Dr. Stern was, for the first part of the War, interned on the Isle of Man as an "enemy alien." *Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00280. Dr. Stern later emigrated to Canada, where he was also interned as a "civilian alien," and released in 1942. *Id.*

Dr. Stern did everything one would expect a theft victim to do to reclaim his property.[3] Beginning soon after the War, he pursued and recovered paintings through the Canadian Military Mission (*Letter from Under-Secretary of State for External Affairs Canada to Stern*, March 3, 1948 (*Vineberg Dec.* Ex. 16)), and pursued further recoveries through the military government for the British zone of occupation, which included Düsseldorf and Cologne (*Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12)).

Later, Dr. Stern initiated proceedings in Germany to recover paintings and other property seized by the Gestapo. *Claim form by Dr. Stern*, dated Feb. 28, 1958 (*Vineberg Dec.* Ex. 13). He also pursued claims for monetary compensation for his art losses through the German restitution courts in the early 1960s. Decision by Higher District Court (Landgericht) Düsseldorf in *Dr. Stern v. Land Nordrhein-Westfalen*, 26 O (Entsch) 454/62 (Feb. 24, 1964) ("Stern v. Land

[3] In *Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg & Feldman Fine Arts, Inc.*, the Court lays out the due diligence undertaken by the Church to find its mosaics, including notification of appropriate organizations upon learning of the disappearance, using press releases and other publicity to spread the word of the loss, and talking to people in the art market likely to be involved with Byzantine art. 717 F. Supp. 1374, 1389-91 (S.D. Ind. 1989). The Court found these actions to constitute due diligence. Dr. Stern and his trustees undertook similar efforts.

Nordrhein-Westfalen") (*Vineberg Dec.* Ex. 15). In 1964, the court awarded Dr. Stern partial damages, known as "Verschleuderungsschaden," for his loss of profit in being forced to sell his inventory of paintings at prices below what he could have received in the ordinary course of business. *Id.* at 3 (SE00553). Despite these and other efforts, most of Stern's collection was not recovered in post-War proceedings.

Stern, on his own initiative, went beyond the government-provided channels to alert the art world and to search for his lost art. He advertised losses in the magazine *Canadian Art* ("A Search for Lost Paintings," *Canadian Art* (Christmas 1948), at 90-91 (*Vineberg Dec.* Ex. 14)) and in *Die Weltkunst* (*Die Weltkunst* (August 1, 1952), at 18 (*Vineberg Dec.* Ex. 18)). In 1949, Dr. Stern visited Europe with his wife to trace lost paintings. *Letter from Secretary of State for External Affairs Canada to Victor Doré, Canadian Ambassor to Belgium*, dated May 3, 1949 (*Vineberg Dec.* Ex. 17). More recently, Stern Estate registered losses with the Art Loss Register ("ALR") for placement in the database of stolen art ALR maintains in London (*Vineberg Dec.* Ex. 20), and with Germany's Lost Art Internet Database (lostart.de) for posting on the website maintained by the art recovery center for the German states (*Vineberg Dec.* Ex. 20).

Bissonnette moved to the United States in or before 1956. *Obituary of Dr. Karl Wilharm*, dated Jan. 20, 1956 (*Kline S.J. Dec*. Ex. 9) (stating that Bissonnette, under former married name Maria-Louise Youmans, resides in Arlington, Virginia). Bissonnette shipped the Painting to this country in 1959. *Letter from Schenker & Co. to M. Youmans [Bissonnette's former married name] with shipping documents*, dated 1959 (*Kline S.J. Dec*. Ex. 8). She later moved to Rhode Island, arriving here in or before 1991. *Accurint report*, downloaded on June 15, 2007 (*Kline S.J.* Ex. 10) (showing address in Rhode Island in 1991). In 1991, Bissonnette inherited the Painting from her mother, Baroness von Morsey Pickard, who had come into sole possession of

it on her husband's death. *Compl.* ¶¶ 28, 30; *Bissonnette Ans.* ¶¶ 28, 30; *Bissonette's First 12(b) Aff.* ¶¶ 4-5; *Fusco Aff.* ¶ 3.

In April 2003, Bissonnette consigned the Painting to Estates Unlimited, Inc. ("EU") here in Rhode Island. *Compl.* ¶ 37; *Bissonnette Ans.* ¶ 37; *Fusco Aff.* ¶ 2 & Ex. A. EU posted the Painting on the Internet to publicize and market it (*Fusco Aff.* ¶ 6); as a result, Stern Estate learned from the ALR that EU was selling the Painting. ALR contacted EU, informing it that Stern Estate claimed ownership of the Painting (*id.* ¶ 7 & Ex. D), and requesting that EU withdraw the Painting from the auction (*id.* ¶ 8). EU agreed, withdrawing the Painting, providing Bissonnette's identity and contact information to ALR, and informing Bissonnette of the claim. *Id.* Bissonnette told EU that a claim would be "ridiculous" and "impossible." *Id.*

On or about January 11, 2005, Stern Estate filed a claim for restitution of the Painting with the Holocaust Claims Processing Office ("HCPO"), New York State Banking Department. *Declaration of Anna B. Rubin*, dated Dec. 15, 2006, previously filed with the Court as Ex. 2 to Pl.'s Mem. of Law in Supp. of Pl.'s Objection to Def. Bissonnette's 12(b) Mot. to Dismiss and/or for Stay ("Rubin Dec."), ¶ 3. Bissonnette received Stern Estate's claim from HCPO with EU's assistance. *Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41; *Fusco Aff.* ¶¶ 8, 11.

Bissonnette negotiated with Stern Estate through the good offices of the HCPO (*Rubin Dec.* ¶¶ 3-4), but ultimately refused to turn the Painting over to Stern Estate. *Compl.* ¶¶ 41-42; *Bissonnette Ans.* ¶¶ 41-42. Instead, using U.S. Postal Service facilities here in Providence, Bissonnette spirited the Painting out of the jurisdiction – and the country – in the midst of those settlement discussions after being informed Stern Estate was contemplating litigation. *U.S. Postal Service, Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec.*

Ex. 4); *Rubin Dec.* Ex. 2; *Letter from Cohen to Weltman dated Mar. 30, 2006 and attached Press Release dated Mar. 23,* 2006 (Ex. C to Rubin Dec., Ex. 2)).

With assistance of family and/or attorneys in Germany, Bissonnette (1) obtained an appraisal of the Painting from Lempertz in the range of 50,000-70,000 Euros (approximately $67,000 to $94,000) (*Legal Action* at 10, attachment to *Bissonnette's Second 12(b) Aff.*); (2) attempted to sell the painting through Lempertz (*Letters from Strasoldo to Rosshoff*, dated Aug. 9 and 16, 2006 (*Kline S.J. Dec.* Ex. 6)); and (3) filed suit in Germany because "[o]ther auction houses have also refused to accept the painting for auction in view of the recovery claims asserted." *Legal Action* at 4, attachment to *Bissonnette's Second 12(b) Aff.* In filing suit, Bissonnette informed the Cologne court that the "matter in dispute" was 60,000 Euros or about $87,000. *Legal Action* at 10, attachment to *Bissonnette's Second 12(b) Aff.*

Upon learning of the removal of the Painting and the filing of Bissonnette's Cologne action, Stern Estate commenced this replevin and conversion action with the primary purpose of recovering possession of the Painting. *Compl.* ¶ 1; *Bissonnette Ans.* ¶ 1. This Court ruled that, consistent with normal principles of comity, this case and Bissonnette's action in Germany could go forward simultaneously (*Order*, dated Feb. 22, 2007), but there is no evidence that Stern Estate Trustees have ever been properly served with process. *Vineberg Dec.* ¶ 28. The Court has also ordered Bissonnette to allow Stern Estate to examine the Painting and to refrain from moving it without first obtaining prior permission of the Court. *Order*, dated June 12, 2007. The Court-established June 18, 2007 deadline for dispositive motions having arrived, Stern Estate moves for summary judgment on its replevin and conversion claims and demonstrates, below, that there are no material disputed facts and it is entitled to entry of judgment as a matter of law.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Even if parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Once the moving party has made a sufficient showing, the non-moving party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995) (quoting *Anderson*, 477 U.S. at 249-50).

## ARGUMENT

### I. PARTIES, JURISDICTION AND VENUE.

The Last Will and Testament of the late Dr. Stern provided for the creation of Stern Estate to receive the Painting and other property, and appointed Peter Lurie, H. Heward Stikeman, Q.C., and Philip Fischel Vineberg, Q.C., as the original executors of the Will and trustees of Stern Estate. *Last Will and Testament of Dr. Stern* ("Stern Will") at SE00886-87 (*Vineberg Dec.* Ex. 9). All three of the original trustees have subsequently deceased. In accordance with the provisions of the Stern Will, Peter Lurie was replaced as trustee by Sydney Feldhammer (*Stern Will* at SE00887 (*Vineberg Dec.* Ex. 9)) and Philip Vineberg was replaced by R. Fraser Elliott, Q.C. *Id.* Mr. Elliott resigned his position as trustee on January 27, 2004 (*Memorandum of the Executors and Trustees of the Estate of Dr. Stern*, dated Feb. 12, 2004 (*Vineberg Dec.* Ex. 1)) and was replaced by Michael D. Vineberg by instrument in writing dated February 12, 2004 (*id.*), as required by the Will. *Stern Will* at SE00887. Heward Stikeman was

replaced as trustee by Robert S. Vineberg by instrument in writing dated February 18, 2000 (*Memorandum of the Executors and Trustees of the Estate of Dr. Stern*, dated Feb. 18, 2000 (*Vineberg Dec.* Ex. 1)), as required by the Will. *Stern Will* at SE00887. As trustees of Stern Estate, Robert S. Vineberg, Michael D. Vineberg and Sydney Feldhammer may represent Stern Estate in litigation and ask that the Court recognize them, in their capacity as Trustees, as the proper representatives of the Plaintiffs in this proceeding. *See, e.g., Moore v. Ballard*, 914 A.2d 487, 488 (R.I. 2007) (Trustee of Foundation acting as plaintiff/appellant).

The Court has personal jurisdiction over Defendant and subject matter jurisdiction over the dispute, as Bissonnette admitted in filing her Motion to Dismiss and/or for Stay of these proceedings in favor her lawsuit. She argued at that time that "notwithstanding jurisdiction and proper venue," the Court could dismiss the case pending resolution of her case in Germany. *Def.'s Mem. in Supp. of 12(b) Mot. to Dismiss and/or Stay* at 4. Bissonnette was served with a summons and complaint in this judicial district, where she resides (*see Compl.* ¶ 3; *Bissonnette Ans.* ¶ 3), and a substantial portion of the events described above occurred here, making venue proper under 28 U.S.C. § 1391(a). *Fusco Dec.* ¶¶ 2-8, 11-12.

With regard to subject matter jurisdiction under 28 U.S.C. § 1332(a)(2), Defendant admits that, as a citizen of the United States and a domiciliary of this State, she is a citizen of Rhode Island (*Compl.* ¶ 3; *Bissonnette Ans.* ¶ 3), making her of diverse citizenship from Stern Estate's Trustees, each of whom is a citizen of Canada. *Vineberg Dec.* ¶¶ 1-3. Bissonnette must also admit that the Painting is colorably worth more than $75,000, having previously sworn to this Court that her complaint in Cologne alleges that the "value of the subject painting is 60,000. Euro," in excess of $80,000, and that the Painting "was appraised by the auction house of Lampertz [*sic*] in the value of 50,000.00 Euro to 70,000.00 Euro," roughly $67,000 to $94,000.

*Bissonnette' First 12(b) Aff.* ¶ 7.l. & k. To satisfy the jurisdictional amount requirement, plaintiff need not show to a scientific certainty that the *res* is worth more than $75,000, merely that the allegation of value was made in good faith and there is a reasonable likelihood that the value of the property exceeds the amount-in-controversy requirement. *See, e.g., Spielman v. Genzyme Corp.*, 251 F.3d 1, 5 (1st Cir. 2001) (quoting *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283 (1938)). Defendant has admitted as much. *Legal Action* at 10, attachment to *Bissonnette's Second 12(b) Aff.* ("The amount in dispute is given as € 60,000.00.").[4]

## II. RHODE ISLAND LAW GOVERNS PLAINTIFF'S REPLEVIN AND CONVERSION CLAIMS.

In a diversity case, a federal court must apply the choice of law analysis of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Crellin Technologies, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994). Therefore, Rhode Island's choice of law rules will determine the substantive law applicable to this case.

In resolving conflict of law disputes arising out of tort actions, Rhode Island employs an interest-weighing approach. *Blais v. Aetna Cas. & Sur. Co.*, 526 A.2d 854, 856 (R.I. 1987). Under this approach, various interests are balanced to determine which jurisdiction has the most significant relationship to a particular substantive issue. *Waters v. Walt Disney World Co.*, 237 F. Supp. 2d 162, 166 (D.R.I. 2002) (citing *Gordon v. Clifford Metal Sales Co.*, 602 A.2d 535, 538-39 (R.I. 1992)); *Pardey v. Boulevard Billiard Club*, 518 A.2d 1349, 1351 (R.I. 1986). In assessing the various interests, a court takes into account (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the place that the parties call

[4] The $50.00 value Bissonnette placed on the Painting when she mailed it to Germany (*U.S. Postal Service, Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec.* Ex. 4)) was clearly misinformation and should be given no weight.

home (*e.g.*, their domicile, residence, place of incorporation, or place of business); and (4) the place where the relationship, if any, between the parties is centered. *Brown v. Church of the Holy Name*, 252 A.2d 176, 179 (R.I. 1969). However, the resolution of choice-of-law problems turns not merely on the number of contacts, but rather on an assessment of the qualitative nature of those contacts to further: (1) predictability of results; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *See Brown*, 252 A.2d at 178. Under Rhode Island's interest-weighing approach, this State has a more significant relationship than Germany.

**A. The Injury Occurred In Rhode Island.**

Upon learning that Defendant possessed the Painting, Stern Estate made a claim with HCPO, which sent a demand letter to Bissonnette through EU (which had the Painting on consignment from Defendant and was undertaking to sell it) seeking return of the Painting. *Letter from Cohen to Bissonnette*, dated February 8, 2006 (*Kline S.J. Dec.* Ex. 11). EU passed this claim on to Bissonnette. *Fusco Aff.* ¶¶ 8, 11. Defendant, however, refused to return the Painting (*Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41), instead whisking it away to Germany – using a local facility – giving rise to Stern Estate's replevin and conversion claims. *U.S. Postal Service, Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec*. Ex. 4). The injury suffered by Stern Estate, therefore, occurred in Rhode Island because it was here that Bissonnette's possession of the Painting became adverse to Stern Estate and wrongful (*see, e.g.*, *Terrien v. Joseph*, 53 A.2d 923, 925 (R.I. 1947) (rightful possession of property by one lacking title becomes a conversion only upon refusal of true owner's demand for return)). This factor weighs in favor of applying Rhode Island law.

**B. The Most Significant Conduct Causing The Injury Occurred In Rhode Island.**

At the time Bissonnette learned of Stern Estate's claim, she was in control of the Painting, having consigned it to EU where it was being offered for sale within this State. *Fusco Aff.* ¶¶ 2, 6; *id.* Ex. A; *Compl.* ¶¶ 41-42; *Bissonnette Ans.* ¶¶ 41-42. From Rhode Island, Defendant refused to return the Painting to its rightful and lawful owner, wrongfully depriving Stern Estate of possession. *Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41. Bissonnette retrieved the Painting from EU and took it to a local store, from which she secretly mailed it out of the jurisdiction (*U.S. Postal Service*, *Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec*. Ex. 4)), after being informed that the Stern Estate was considering suit. *Letter from Cohen to Weltman*, dated Mar. 30, 2006 (*Rubin Dec.* Ex. C). The most significant conduct causing the injury to Stern Estate therefore occurred in Rhode Island, and this factor weighs very heavily in favor of applying Rhode Island law.

**C. Bissonnette Is A United States Citizen Domiciled In Rhode Island.**

Defendant is a United States citizen domiciled in Rhode Island (*Compl.* ¶ 3; *Bissonnette Ans.* ¶ 3), and Trustees of Stern Estate are foreign citizens domiciled in Canada. *Vineberg Dec.* ¶¶ 1-3; *id.* Ex. 1. Thus, consideration of this factor weighs in favor of Rhode Island law.

**D. There Was No Prior Relationship Between The Parties To This Proceeding.**

Prior to the Stern Estate claim on the Painting, no relationship existed between the parties. Therefore, this consideration does not factor into the interest-weighing analysis.

**E. The Qualitative Nature Of Contacts Indicates That Rhode Island Law Applies.**

Qualitative consideration of the context and history of this case further supports the application of Rhode Island law. *See Brown*, 252 A.2d at 178. Predictability of results, maintenance of interstate order, simplification of the judicial task, advancement of the forum's

governmental interest, and application of the better rule of law (*see id.*) all weigh in favor of this Court applying Rhode Island substantive law. In stolen art cases, especially those arising from theft of property during the World War II era, American courts are inclined to apply the substantive law of the jurisdiction where the property has been found:

> The fact that the theft of the paintings did not occur in New York is of no relevance. In applying the New York rule that a purchaser cannot acquire good title from a thief, New York courts do not concern themselves with the question of where the theft took place, but simply whether one took place. Similarly, the residence of the true owner is not significant for the New York policy is not to protect resident owners, but to protect owners generally as a means to preserve the integrity of transactions and prevent the state from becoming a marketplace for stolen goods.

*Kunstsammlungen Zu Weimar v. Elicofon*, 536 F. Supp. 829, 846 (E.D.N.Y. 1981). New York courts, for example, apply local law to questions of title because "New York enjoys a worldwide reputation as a preeminent cultural center" and seeks to avoid becoming a haven for art stolen abroad. *Solomon R. Guggenheim Found. v. Lubell*, 569 N.E.2d 426, 431 (N.Y. 1991).[5]

Bissonnette possessed a Painting claimed to be stolen as a result of Nazi Germany's official persecution of Jews, attempted to market the Painting here, and surreptitiously removed it during settlement discussions for purposes of sale and/or forum shopping in Germany. These events all indicate that the qualitative aspects support application of Rhode Island law, particularly those factors related to maintenance of interstate order by preventing interstate transportation of objects subject to disputed claims of ownership, advancement of governmental interests in protecting the art market, and providing a forum and consistent application of law for victims of persecution whose claims are strongly linked to an American jurisdiction. In light of the foregoing, the forum state has a more significant relationship with the substantive issues in

[5] Other courts have also applied the law of the forum state to property stolen abroad during war or its aftermath. *See Church of Cyprus*, 917 F.2d 278, 286-87.

this case than Germany, as did New York in *Elicofon*, making Rhode Island law applicable to the substantive issues in the case.

## III. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON ITS REPLEVIN AND CONVERSION CLAIMS.

To recover on a replevin claim, a plaintiff ordinarily need only establish that it is entitled to immediate possession of disputed property. *Brunswick Corp. v. Modern Pool Parlor*, 389 A.2d 1251, 1253 (R.I. 1978) ("Nothing more than the right of present possession . . . is necessary to enable plaintiff to maintain [a replevin] action."). Similarly, in conversion, a Plaintiff ordinarily must only show that it "was in possession of the [property], or entitled to possession of the [property], at the time of conversion." *Narragansett Electric Co. v. Carbone*, 898 A.2d 87, 97 (R.I. 2006). However, where, as here, the stolen property was rightfully obtained by the Defendant from one lacking title, the Plaintiff must also demonstrate that a demand for return of the property was made and was refused by the Defendant. *See, e.g.*, *Fuscellaro v. Industrial National Corp.*, 368 A.2d 1227, 1230 (R.I. 1977) ("demand and refusal are usually required before an action for conversion can be brought against the possessor of a chattel who has rightfully obtained possession from one not its owner" (quoting *Claflin v. Gurney*, 17 R.I. 185, 187, 20 A. 932, 933 (1890)).[6] Stern Estate is entitled to summary judgment on its replevin and conversion claims, if it proves: (1) it is the lawful owner of the Painting, (2) the Painting was stolen from Dr. Stern, that is, taken from him without his permission or authorization, (3) it made a demand for return of the Painting and that such demand has been refused; (4) Bissonnette is in wrongful possession.

---

[6] Although the cases cited focus on conversion claims, given the similarity of purpose between replevin and conversion, Stern Estate submits this authority also governs replevin.

**A. The Stern Estate Is The Owner Of The Painting.**

Dr. Stern was the lawful possessor and owner of the Painting prior to the forced sale in 1937. The exact date of Stern becoming the owner of and coming into lawful, quiet possession of the Painting is unknown. In 1937, the Painting was identified in the Lempertz catalog for auction No. 392 as being part of the inventory of Dr. Stern's art gallery. *Stern Catalog* at SE00451, SE00472 (*Vineberg Dec.* Ex. 4); Decision by Higher District Court (Landgericht) Düsseldorf in *Dr. Stern v. Land Nordrhein-Westfalen*, 26 O (Entsch) 454/62 (Feb. 24, 1964) ("Stern v. Land Nordrhein-Westfalen") (*Vineberg Dec.* Ex. 15). Dr. Stern's will leaves the Painting to his Estate. *Stern Will* at SE00886-87 (*Vineberg Dec.* Ex. 9).

**B. The Painting Was Stolen From Stern Estate's Predecessor-in-Interest.**

There is no dispute that the Nazi government of Germany ordered Dr. Stern to sell the Painting against his will and without his voluntary authorization; indeed, Bissonnette recognizes that "Dr. Stern was 'Jewish' in the sense of the national socialist laws. He brought the paintings in his gallery for auction because he had been forced to give up his profession as art dealer in Germany." *Legal Action* at 5, attachment to *Bissonnette's Second 12(b) Aff.* The post-War record confirms West Germany's recognition that Nazi authorities had ordered Dr. Stern to sell his inventory as part of their persecution of Jews, giving him no choice, the Gestapo being his only alternative. *Stern v. Land Nordrhein-Westfalen* at 7-8 (*Vineberg Dec.* Ex. 15). Defendant recognizes that Dr. Stern sought and obtained limited relief from a German court in 1964. *Bissonnette's First 12(b) Aff.* at 2, ¶¶ 7(g)-7(h).

An unauthorized sale ordered as part of official persecution of Jews in Germany constitutes a confiscation and, therefore, theft of the Painting. "The methods used by the Gestapo and the Nazis to force Dr. Stern to sell the painting and thereafter prevent him from using the proceeds from the sale amount to theft." *Nicholas Rpt.* ¶ 4; *see Expert Report and*

*Declaration of Dr. Ulf Bischof*, June 8, 2007 ("Bischof Rpt.") ¶ 8. Nicholas, a well-respected scholar and authority on Nazi and World War II art looting (*see Nicholas Rpt.* ¶ 2), continues, "Dr. Stern's surrender of the painting to Lempertz for auction was ordered by Nazi authorities and therefore the equivalent of an official seizure or a theft. The sale was forced by the Nazi government and also a theft as we would commonly understand the term." *Id.* ¶ 9.[7] Under dominant U.S. standards applicable under Rhode Island law, an unauthorized taking of property during wartime is theft (*Menzel v. List*, 267 N.Y.S.2d 804, 810-12 (N.Y. Sup. Ct. 1966) (Nazi seizure of art in occupied territory)) and, Plaintiff submits, the same principles apply here.

As in *Church of Cyprus*, where the owner was displaced from the vicinity of the local church and did not thereby abandon mosaics on the church wall, Dr. Stern did not abandon his property by complying with an order to sell. 717 F. Supp. at 1397-99. In *Cyprus*, the Church showed that it had owned the mosaics for years and had never voluntarily abandoned them. *Id.* at 1398. This absence of abandonment by the true owner led the Court to find that the mosaics were, indeed, stolen. *Id.* at 1398-99; *accord Menzel*, 267 N.Y.S.2d at 806, 809-10 (Jewish couple fleeing Belgium "before the oncoming Nazis" leaving possessions behind and later returning to claim them did not abandon painting). Dr. Stern did not abandon the Painting by selling it or by fleeing. *Nicholas Rpt.* ¶ 8 ("The gradual aspect of the implementation of the Jewish laws gave false hope to many, who went along with Nazi demands until it became obvious that flight on Nazi terms was the only real option.").

Nor, under U.S. legal standards, did Dr. Stern voluntarily authorize or permit the sale of the Painting. Rather, the Nazi government of Germany ordered that the Painting – along with the rest of Dr. Stern's Gallery and personal collection – be sold under circumstances in which Dr.

[7] Nicholas also concludes that Dr. Stern was "never able to access or use the proceeds of the sale of the Painting." *Nicholas Rpt.* ¶ 7.

Stern could not use the proceeds. *Nicholas Rpt.* ¶¶ 4-9. The Nazis did not obtain title to art they looted. *Menzel*, 267 N.Y.S.2d at 812, *citing* H.A. Smith, *Booty of War*, 23 Brit. Yb. Int'l. L. 227, 238-39 (Oxford 1946) ("The Germans have acquired no title to private movable property . . . which has been acquired by theft, looting, or pillage."); *accord Church of Cyprus*, 717 F. Supp. at 1398-99 (defendant provided no evidence of permission or voluntary authorization for a sale). Dr. Stern contested the order to sell for as long as he dared, and only turned the Painting over for sale by Lempertz when further dispute was futile. *Nicholas Rpt.* ¶ 6 ("[O]n September 13, 1937 Stern was advised by the Nazi authorities that no further appeals would be entertained and that he must sell any works of art still in inventory of the Stern Gallery through an auctioneer or dealer who was an approved member of the Reich Chamber of Culture."); *Letter from Chamber to Stern*, Sept. 13, 1937 (*Vineberg Dec.* Ex. 6).

Alternatively, the Bischof Report makes clear that, under post-War and contemporary German legal standards, the Painting was officially confiscated, and Dr. Wilharm did not acquire title through the 1937 Lempertz auction. "Dr. Stern was exposed to severe pressure and threat at least to his socio-economic life at the time of the sale in 1937 . . . . Dr. Stern was forced to shut his gallery due to orders which aimed at excluding him from running his art gallery, subsequently earning his living, only because of his Jewish religion. There can be no doubt that the sale of the . . . painting in question is a direct consequence from this situation and does therefore by law constitute a confiscation of the painting . . . ." *Bischof Rpt.* ¶ 8. Also, Dr. Bischof states, "It is my opinion that the sale of the painting in question at Lempertz auction house in 1937 constitutes a confiscation under applicable German law. In the context of Dr. Stern's claim in this case Dr. Wilharm did not receive title." *Id.* ¶ 8. Since under German law a thief cannot acquire title to stolen property or pass title to third parties (*id.* ¶ 6), Dr. Wilharm did

not acquire title to the Painting; nor did he pass title to his wife or step-daughter. *Id.* Thus, as the Nicholas and Bischof Reports establish – whether one looks to American or German legal standards – the Painting was improperly taken and, therefore, has to be regarded as stolen from Dr. Stern. *Nicholas Rpt.* ¶ 9; *Bischof Rpt.* ¶ 8.

**C. Defendant Refused Plaintiff's Demand That The Painting Be Returned.**

There is no dispute that Stern Estate demanded return of the Painting from Bissonnette, or that she refused this demand and now retains control over the Painting. *Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41; *Bissonnette's First 12(b) Aff.* ¶¶ 6, 7(j). Plaintiff first learned that the Painting was located in Rhode Island on or about January 5, 2005. Shortly thereafter, Plaintiff made claim for restitution with the HCPO. *Rubin Dec.* ¶ 4; *Letter from Cohen to Bissonnette*, dated Feb. 8, 2006 (*Rubin Dec.* Ex. A). On or about February 8, 2005, the HCPO, acting on Stern Estate's behalf, sent a demand letter to Defendant through EU, which had the Painting on consignment. *Id.* Defendant refused to return the Painting as demanded by HCPO (*Compl.* ¶ 41; *Bissonnette Ans*. ¶ 41), giving rise to Plaintiff's replevin and conversion claims.

**D. Having Had Its Demand Refused, Stern Estate Is Entitled To Immediate Possession, Since The Painting Is In Bissonnette's Wrongful Possession.**

Stern Estate recognizes that Bissonnette, having come into possession of the Painting by inheritance from her mother (*Bissonette's First 12(b) Aff.* ¶¶ 4-5), acquired it without wrongdoing on her own part. Nonetheless, Bissonnette's predecessor-in-interest, Dr. Wilharm, did not acquire title through the forced sale which was "a theft as we would commonly understand the term." *Nicholas Rpt.* ¶ 9; *accord Bischof Rpt.* ¶¶ 8-10. As explained above, under generally accepted principles in the United States and Germany, a thief does not obtain and cannot pass title. *Menzel*, 267 N.Y.S.2d at 812; *Bischof Rpt.* ¶ 6. Bissonnette recognizes that she could only acquire "all of my mother's property and any interest of her[s] into the

painting . . . ." *Bissonnette's First 12(b) Aff.* ¶ 5. Thus, whether one looks to U.S. or German law, Dr. Stern never lost and Bissonnette never received title.[8]

Lacking title, once Bissonnette refused Stern Estate's demand and exercised dominion and control over the Painting by taking it back from EU and shipping it to Germany with the intention to sell it there or sue,[9] her possession became wrongful, entitling Stern Estate, as the true owner, to bring this replevin and conversion action seeking immediate possession. *Fuscellaro*, 368 A.2d at 1230. Undisputed facts therefore show that Bissonnette is in wrongful possession of the Painting and Stern Estate is entitled to summary judgment on these claims.

## IV. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON BISSONNETTE'S STATUTE OF LIMITATIONS AND LACHES DEFENSES.

### A. Stern Estate's Replevin And Conversion Claims Are Timely Under Rhode Island's Statute Of Limitations.

Under Rhode Island law, courts apply a ten-year statute of limitations in replevin and conversion. R.I. Cts. and Civ. Proc. § 9-1-13(a).[10] Rhode Island law has long provided that a cause of action against one, like Bissonnette, who was in rightful possession of stolen property, accrues only upon refusal of the true owner's demand for return: "It is well-established that a demand and refusal are usually required before an action for conversion can be brought against

---

8 Dr. Bischof explains that German statute of limitations law provides "a procedural argument a defendant could raise when confronted with a claim in Germany . . . but has no legal effect on the underlying legal right itself, that is, it does not affect the title or the transfer of title." *Bischof Rpt.* ¶ 6. The unavailability of a replevin claim in the German courts, under the German statute of limitations, does not and cannot change this outcome. *Id.* ¶¶ 4-6. ("[T]he fact that the rightful owner of such stolen property – no matter of what kind – is prevented from pursuing a claim in a German court after 30 years as a result of the statute of limitations does not mean that title passes to the thief under German law after those thirty years are elapsed." *Id.* ¶ 6.)

9 "[T]he value [of the painting] is to be estimated in view of the intention to have the painting put up for auction." *Legal Action* at 3, attachment to *Bissonnette's Second 12(b) Aff.*

10 "Except as otherwise specially provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after."

the possessor of a chattel who has rightfully obtained possession from one not its owner. *Claflin v. Gurney*, 20 A. 932, 933 (R.I. 1890)." *Fuscellaro*, 368 A.2d at 1230. As explained in *Claflin*:

> The reason why a demand is necessary where a person, who has come into possession of a chattel rightfully, continues simply to hold it, is because until he refuses to give it up there is no evidence of a conversion; and ordinarily a refusal does not precede but follows a demand. The conversion consists in the retention of the chattel under a claim of right, or in the assumption of a dominion over it in contravention of the owner's right. "The very denial of goods to him that has a right to demand them," says Lord Holt in *Baldwin v. Cole*, 6 Mod. 212, "is an actual conversion, and not only evidence of it, as has been holden; *for what is a conversion but an assuming upon one's self the property and right of disposing of another's goods, and he that takes upon himself to detain another man's goods from him without cause, takes upon himself the right of disposing of them*."

20 A. at 933 (emphasis added). This principle is often repeated by Rhode Island courts: "Where a person comes into possession of a chattel rightfully and continues simply to hold it, a demand by the owner is necessary before there can be a conversion. In such a case, if a refusal follows the demand, there is proof of a conversion, as the person in possession of the chattel then, in contravention of the owner's right, retains it under a claim of right or exercises dominion over it." *Terrien*, 53 A.2d at 925. It remains bedrock law on conversion in Rhode Island. *See Gaudet v. Jawharian*, No. 70-863, 1982 R.I Super. LEXIS 179, at * 7 (Dec. 9, 1982).[11]

This approach is also appropriate in replevin cases. Although replevin and conversion are separate causes of action under Rhode Island law, they both remedy the same injury, that is, taking of personal property. In replevin, plaintiff seeks return of the *res* (*see, e.g.*, *Goldberg v. Lancellotti*, 503 A.2d 1129, 1131 (R.I. 1986) (replevin "provide[s] for the return of property to

[11] On this point, Rhode Island law parallels the also well-established rule in New York that: "Until demand is made and refused, possession of the stolen property by the good-faith [possessor] is not considered wrongful." *Lubell*, 569 N.E.2d at 429; *accord Elicofon*, 536 F. Supp. at 848.

the person entitled to possession")), while in conversion plaintiff requests damages arising from the wrongful taking (*see, e.g.*, *Narragansett*, 898 A.2d at 96-99 (action for conversion based on loss of value of property)), most often the value of the *res* but including harm to the property. Given the similarity of purpose between the two causes of action – making whole the victim of an unauthorized taking of personal property – Rhode Island conversion law is, at the very least, instructive on replevin. Indeed, given their similarity of purpose, there is no principled reason to treat the two causes of action differently for statute of limitations analysis, since damages will be an inadequate remedy where the property – like art – is unique. Stern Estate submits that Rhode Island's rule that rightful possession of stolen property does not become wrongful until the possessor refuses demand for return of the property (*Fuscellaro*, 368 A.2d at 1230), is equally applicable in both conversion and replevin.

Here, Bissonnette assumed possession of the Painting upon her mother's death in 1991. *Bissonnette's First 12(b) Aff.* ¶ 5. The nature of her possession changed only when, in 2005, Bissonnette received and refused Stern Estate's claim (*Letter from Cohen to Bissonnette*, dated Feb. 8, 2005 (*Kline S.J. Dec.* Ex. 11); *Fusco Aff.* ¶ 8; *Compl.* ¶ 41-42; *Bissonnette Ans.* ¶ 41-42), and, after being informed that Stern Estate was considering filing suit (*Letter from Cohen to Bissonnette*, dated May 12, 2005 (*Kline S.J. Dec*. Ex. 12)), shipped the Painting to Germany (*U.S. Postal Service, Customs Declaration and Dispatch Not*e, dated Sept. 15, 2005 (*Kline S.J. Dec*. Ex. 4)), filing suit there and providing the Painting to the Lempertz auction house with the intent to sell it. *Letters from Strasoldo to Rosshoff*, dated Aug. 9 and 16, 2006 (*Kline S.J. Dec*. Ex. 6); *Bissonnette First 12(b) Aff.* ¶ 7.k. There could scarcely be a stronger indication than the one Bissonnette has given that, after having been informed of Stern Estate's claim, she attempted

to assume, in Lord Holt's language, "the property and right of disposing" of the Painting then claimed by Stern Estate. *Clafin*, 20 A. at 933.

As explained above, Dr. Wilharm, Baroness von Morsey Pickard, and Defendant Bissonnette all lacked title to the Painting, yet Bissonnette's possession only became wrongful in 2005 when she refused to return the painting and shipped it to Germany in direct defiance of the Stern Estate claim. This suit, having been filed May 8, 2006, with summons and complaint served soon thereafter, is unquestionably timely under Rhode Island statute of limitations law.

**B. Lacking Prejudice, Bissonnette Cannot Prevail On A Laches Defense.**

Bissonnette asserts, but cannot prevail on, a laches defense, on which she carries the burden to show unreasonable delay by Stern Estate in bringing its claim, such delay causing prejudice to her. *See, e.g., Adam v. Adam*, 624 A.2d 1093, 1096 (R.I. 1993) ("laches . . . is not mere delay, but delay that works a disadvantage to another") (citing *Chase v. Chase*, 37 A. 804, 805 (R.I. 1897)); *Lubell*, 77 N.Y.2d at 626, 569 N.E.2d at 429 ("appellant's lack of diligence argument was more in the nature of laches than the Statute of Limitations and . . . as a result, the appellant needed to show that she had been prejudiced by the museum's delay in demanding return of the [object].").

After learning of the whereabouts of the Painting, Stern Estate acted diligently in promptly filing a claim with the HCPO, engaging Bissonnette in settlement discussions, and, upon learning of her lawsuit, initiating this proceeding. The determination of the quantum of diligence that might be required is based on what would be reasonable under all of the circumstances. *Houle v. Collatos*, No. 77-1295, 1982 U.S. Dist. LEXIS 10693, at *12 (D. Mass. Feb. 2, 1982)("[l]aches is determined in light of all existing circumstances"). Here, it is beyond dispute that the Painting spent almost seven decades in the Wilharm/Bissonnette family possession, broken by only one exhibition in the 1950s in Kassel, Germany (*Bissonnette's First*

*12(b) Aff.* ¶ 10), and Dr. Stern and his Estate could not possibly have found it any sooner through any level of diligence. Likewise, it is undisputed that, with Lempertz auction house having been heavily damaged during the War, no records were available to identify the purchaser of the Painting.

Stern Estate can also show that Dr. Stern made reasonable efforts, beginning with his post-War claims, to pursue lost objects from the Stern collection in those instances where he did have documents.[12] In 1948, Dr. Stern worked through the Canadian Military Mission (*Letter from Under-Secretary of State for External Affairs Canada to Stern*, March 3, 1948 (*Vineberg Dec.* Ex. 16)), and through the military government for the British zone of occupation (*Claim form by Dr. Stern*, dated Dec. 27, 1948 (*Vineberg Dec.* Ex. 12)) to locate and recover stolen objects. He also went to the art market for help, placing an advertisement in *Canadian Art* entitled "A Search for Lost Paintings" in 1948 (*Vineberg Dec.* Ex. 14), and another in *Die Weltkunst* on August 1, 1952 (*Vineberg Dec.* Ex. 18). Stern even went back to Europe to try to find lost paintings. *Letter from Secretary of State for External Affairs Canada to Victor Doré, Canadian Ambassor to Belgium*, dated May 3, 1949 (*Vineberg Dec.* Ex. 17).

Later, Dr. Stern initiated proceedings in Germany for the recovery of paintings. *Claim form by Dr. Stern*, dated Feb. 28, 1958 (*Vineberg Dec.* Ex. 13). He also pursued monetary compensation for his art and other losses through the German restitution courts. *Stern v. Land Nordrhein-Westfalen* (*Vineberg Dec.* Ex. 15). More recently, Stern Estate has registered its losses with the ALR and lostart.de. *Vineberg Dec.* Ex. 19; *id.* Ex. 20.

Even if Bissonnette could carry her burden to show that these actions do not, under all the circumstances, mean that Dr. Stern and Stern Estate were reasonably diligent in pursuing losses,

---

[12] *See* note 3.

to prevail on her laches defense, Bissonnette also would have to prove she "changed [her] position in a way that would not have occurred if the plaintiff had not delayed." *Harley-Davidson, Inc. v. Estate of O'Connell*, 13 F. Supp. 2d 271, 282 (N.D.N.Y. 1998). No evidence indicates Bissonnette changed her position after she acquired the Painting from her mother by inheritance in 1991 (until she received the Stern Estate claim), or that any witnesses have died or documents been lost since then. She cannot, therefore, demonstrate prejudice from any conceivable delay on the part of Dr. Stern or his Estate in bringing this case.

## V. STERN ESTATE IS ENTITLED TO SUMMARY JUDGMENT ON BISSONNETTE'S *RES JUDICATA* AND COLLATERAL ESTOPPEL DEFENSES.

In her Answer, Bissonnette asserts that Stern Estate's replevin and conversion claims must be barred because Dr. Stern obtained relief from a German Court in 1964 in post-War compensation proceedings. *Bissonnette Ans.*, Fourth Defense. Since Defendant does not allege to have been a party to those proceedings, her assertion of a *res judicata* defense is unfounded. *Breneman v. United States ex rel. FAA*, 381 F.3d 33, 38 (1st Cir. 2004) ("identicality of parties in the two actions" is required for *res judicata* claim).

Likewise, collateral estoppel does not bar the instant case. For collateral estoppel to apply, the parties "must have actually litigated the facts in question, and those facts must have been essential to a valid and final judgment in a prior action." *See, e.g., Moron-Barradas v. Dep't of Educ. of P.R.*, No. 06-1456, 2007 U.S. App. LEXIS 12107, at *15 (1st Cir. May 24, 2007). The facts at issue in this proceeding – those surrounding the theft and ownership of the Painting – have never been litigated and resolved in a manner adverse to Stern Estate's claims. Nor did the West German post-War proceeding on which Defendant bases her collateral estoppel argument result in a finding that Dr. Stern's title to the Painting had been lost. Therefore, collateral estoppel does not preclude Stern Estate's claims. Rather, the West German post-War

court's findings in favor of Dr. Stern and its award of partial compensation for the destruction of his gallery (*Stern v. Land Nordrhein-Westfalen* (*Vineberg Dec.* Ex. 15)) only strengthen Stern Estate's claim that Dr. Stern was the rightful owner of the Painting, that his property was confiscated under National Socialist authorities in Germany, that this taking was viewed as a theft after the War, and that Dr. Stern's ownership rights continue.

To the extent Bissonnette's *res judicata* and collateral estoppel defenses intend to invoke a different legal theory, namely, that Stern Estate would receive a double recovery by prevailing in this case (*Defendant Maria-Louise Bissonnette's Statement of Facts*, dated July 20, 2006, ¶ 2 ("decedent sought *and obtained* restitution from a German court" (emphasis in original)), no evidence supports such a defense. Dr. Stern did not obtain restitution, that is, return of the Painting – the primary relief sought here – since the Painting could not be located. Bissonnette admits that she cannot establish that Dr. Stern was compensated for loss of this Painting, alleging in Germany that "It is also not clear whether the dumping claim [being forced to sell paintings in bulk, below market price] also relates to the picture here in dispute . . . ." *Legal Action* at 6, attachment to *Bissonnette's Second 12(b) Aff.* Dr. Stern received limited compensation for lost profits, but there is no evidence he surrendered title to the Painting in connection with that award. Since Dr. Stern retained title, Stern Estate is free to pursue the Painting here, with any question of duplicative compensation to be determined between Stern Estate and German authorities. *See Erisoty v. Rizik*, No. 93-6215, 1995 U.S. Dist. LEXIS 2096, *21-24 (E.D. Pa. Feb. 23, 1995), *aff'd*, No. 95-1807, 1996 U.S. App. LEXIS 14999 (3d Cir. May 7, 1996).

## CONCLUSION

For all of the foregoing reasons, Stern Estate asks that this Honorable Court (i) substitute Robert S. Vineberg, Michael D. Vineberg and Sydney Feldhammer, each of whom is a Trustee of the Dr. and Mrs. Stern Foundation, as Plaintiffs in this proceeding, (ii) direct the Clerk of the

Court to amend the case caption to read: "Robert S. Vineberg, Michael D. Vineberg and Sydney Feldhammer, as Trustees of the Dr. and Mrs. Stern Foundation v. Maria-Louise Bissonnette"; (iii) enter summary judgment in favor of Stern Estate on its replevin and conversion claims, and (iv) direct Defendant to turn the Painting over to Stern Estate forthwith.

Dated: June 18, 2007

_*/s/ Thomas R. Kline*_____________
ANDREWS KURTH LLP
Thomas R. Kline (admitted *pro hac vice*)
thomaskline@andrewskurth.com
L. Eden Burgess (admitted *pro hac vice*)
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

__*/s/ Samuel D. Zurier*_________
TILLINGHAST LICHT LLP
Samuel D. Zurier (R.I. Bar No. 3576)
szurier@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

**CERTIFICATE OF SERVICE**

I the undersigned hereby certify that on June 18, 2007, the foregoing was served by first-class U.S. mail, postage prepaid, and by certified mail on:

Maria-Louise Bissonnette
59 Park Row W
Apt. 905
Providence, RI 02903

____*/s/ Miranda Perkins*________