**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Max Stern Estate, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Act. No. 06-211 (ML)** |
| | § | |
| Maria-Louise Bissonnette, *et al.* | § | |
| | § | |
| Defendants. | § | |
| | § | |

**STERN ESTATE'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civ. R. 56, the Dr. and Mrs. Max Stern Foundation ("Stern Estate"), through its trustees, hereby submits the following Statement of Undisputed Facts in support of its Motion for Summary Judgment.

**PARTIES**

1. Robert S. Vineberg, Michael D. Vineberg, and Sydney Feldhammer are the three trustees of Stern Estate. *Declaration of Robert S. Vineberg*, June 18, 2007 ("Vineberg Dec.") ¶¶ 1-5 & Exs. 1, 2 & 9. As trustees of Stern Estate, Messrs. Vineberg, Vineberg, and Feldhammer may represent Stern Estate in litigation and are the proper Plaintiffs in this proceeding. *Id.*

2. Plaintiffs Robert S. Vineberg, Michael D. Vineberg, and Sydney Feldhammer are foreign citizens, being citizens of Canada. *Vineberg Dec.* ¶¶ 1-3.

3. Defendant Bissonnette is a citizen of the State of Rhode Island and a citizen of the United States. Defendant Bissonnette is a domiciliary of the State of Rhode Island, residing at 50 Park Row W, Apartment 905, Providence, Rhode Island. *Defendant Bissonnette's Answer to Complaint*, June 15, 2006 ("Bissonnette Ans.") ¶ 3.

**JURISDICTION AND VENUE**

4. The amount in controversy exceeds $75,000, exclusive of interest and costs. *Legal Action* at 10, attachment to *Defendant Maria-Louise Bissonnette's Affidavit as to Pending Suit in Cologne*, *Germany* ("Bissonnette's Second 12(b) Aff.").

5. A substantial part of the events or omissions giving rise to the claim occurred in this district. *Affidavit of Steven Fusco*, June 5, 2007 ("Fusco Aff.") ¶¶ 2-4, 6-7, 8, 11-13.

6. Bissonnette resides in Rhode Island, and resided in Rhode Island at the time of the relevant events. *Compl.* ¶ 3; *Bissonnette Ans.* ¶ 3; *Fusco Aff.* Ex. A.

7. Bissonnette consigned the Painting to a Rhode Island auction house, Estates Unlimited, for sale, and signed its consignment contract. *Fusco Aff.* Ex. A.

8. In furtherance of the Consignment Agreement, Estates Unlimited offered the Painting for sale in Rhode Island, and took steps in Rhode Island to market the Painting and otherwise prepare it for auction, including creation and distribution of an auction brochure, and advertising the auction in a trade periodical and on Estates Unlimited's website. *Fusco Aff.* ¶ 6 & Ex. C.

9. On January 5 and 6, 2005, the Art Loss Register communicated with Estates Unlimited in Rhode Island by telephone, facsimile, and email about Stern Estate's claim of ownership and right to possession of the Painting. *Fusco Aff.* ¶¶ 7-8 & Ex. D. As a result of these communications, Estates Unlimited withdrew the Painting from the auction. *Id.* ¶ 8.

10. On or about January 11, 2005, Stern Estate filed a claim with the Holocaust Claims Processing Office ("HCPO") of the New York State Banking Department. *Declaration of Anna B. Rubin*, dated December 15, 2006 ("Rubin Dec.") ¶ 3. Estates Unlimited informed Mrs. Bissonnette, in Rhode Island, of Stern Estate's claim and provided her with copies of the relevant correspondence. *Fusco Aff.* ¶ 8.

11. Bissonnette retrieved the Painting from Estates Unlimited in Rhode Island, arriving in person at the auction house to do so. *Fusco Aff.* ¶ 12.

12. Bissonnette shipped the Painting, the property that is the subject of the action, to the United States in 1959. *Letter from Schenker & Co. to Youmans [former married name of Bissonnette] with shipping documents*, dated 1959 (Declaration of Thomas R. Kline in Support of Stern Estate's Motion for Summary Judgment ("Kline S.J. Dec.") Ex. 8). The Painting was situated in this district from sometime before 1991 (*Accurint report*, downloaded on June 15, 2007 (*Kline S.J.* Ex. 10) (showing Bissonnette address in Rhode Island in 1991)), until it was shipped by Bissonnette from Rhode Island to Germany in 2005. *U.S. Postal Service, Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec.* Ex. 4); *Rubin Dec.* ¶¶ 3, 7.

## BACKGROUND

### I. The Galerie Stern.

13. In or about 1913, Dr. Max Stern's father Julius Stern opened an art gallery in Düsseldorf, Germany. *Highlights from the Max Stern Collection, Max Stern Chronology (Philip Dombowsky, Project Archivist, Dominion Gallery Archives)* ("Highlights"), at SE00780 (*Vineberg Dec.* Ex. 3).

14. Julius Stern passed away in 1934, leaving his gallery to his son Dr. Max Stern, who became the sole owner. *Id.* *See also Claim form by Dr. Max Stern*, dated December 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00279. Dr. Stern was a Jew and, under the Nuremberg laws, subject to official persecution by the German government on that basis. Decision by Higher District Court (Landgericht) Düsseldorf in *Dr. Max Stern v. Land Nordrhein-Westfalen*, 26 O (Entsch) 454/62 (Feb. 24, 1964) ("Stern v. Land Nordrhein-Westfalen") at 2 (*Vineberg Dec.* Ex. 15). *See also The Nuremberg Laws on Citizenship and Race: September 15, 1935*, Art. 4.(1) (downloaded from http://www.mtsu.edu/~baustin/nurmlaw2.html on June 14, 2007) (*Kline S.J.*

*Dec.* Ex. 7); *First Supplementary Decree of November 14, 1935*, Article 2.(3) (*Kline S.J. Dec.* Ex. 7).

15. The property in dispute is a nineteenth century painting by Franz Xaver Winterhalter entitled "Mädchen aus den Sabiner Bergen" ("Girl from the Sabiner Mountains") (the "Painting"). *Plaintiff's Complaint*, dated May 8, 2006 ("Compl.") ¶ 11; *Bissonnette Ans.* ¶ 11; *Lempertz catalogue for auction No. 392, entitled "Die Bestände der Galerie Stern - Düsseldorf"* [Inventory of Galerie Stern - Düsseldorf] ("Stern Catalogue") at SE00790a, SE00793a-94a (*Vineberg Dec.* Ex. 4).

16. The Painting is unique and valuable. *Legal Action* at 10, attachment to *Bissonnette's Second 12(b) Aff.*; *Vineberg Dec.* ¶ 25.

**II. The Forced Sale of Dr. Stern's Collection.**

17. Starting in 1935, the Reichskammer der bildenden Künste ("Reich Chamber for the Fine Arts"), a subsidiary of the Reichskulturkammer ("Reich Chamber of Culture") and an official organization of the Nazi government of Germany, sent letters to Dr. Stern, demanding that he liquidate his inventory and gallery. *Letter from Reichskammer der bildenden Künste to Stern*, Aug. 29, 1935 (*Vineberg Dec.* Ex. 5); *Declaration and Expert Report of Lynn H. Nicholas*, Dec. 28, 2006 ("Nicholas Rpt.") ¶ 6.

18. On or about September 13, 1937, Dr. Stern received a final irrevocable order to sell his inventory immediately through a dealer approved by the Reich Chamber for the Fine Arts. The Reich Chamber for the Fine Arts gave Dr. Stern until December 15, 1937 to liquidate his inventory and dissolve the gallery. *Letter from Chamber to Stern*, Sept. 13, 1937 (*Vineberg Dec.* Ex. 6); *Nicholas Rpt.* ¶ 6.

19. Dr. Stern consigned most of his inventory and private collection, constituting hundreds of works, to Kunsthaus Lempertz ("Lempertz auction house") in Cologne, Germany.

*Stern Catalogue* (*Vineberg Dec.* Ex. 4); *Excerpt from Lempertz website*, at SE00856 (*Kline S.J. Dec.* Ex. 2) (listing Galerie Stern, Düsseldorf as an auction conducted by Lempertz in 1937); *Auktion 392* (Faculty of Fine Arts Gallery, Concordia University, Oct. 19, 2006), at SE01351 (*Vineberg Dec.* Ex. 8).

20. The Lempertz auction house was founded in 1845 and still operates in Cologne. *Excerpt from Lempertz website*, at SE00849 (*Kline S.J. Dec.* Ex. 2). Its website includes the Lempertz/Stern Sale on its list of "The most Important Sales, Collections and Estates since 1888." *Id.* at SE00852, SE00856.

21. On or about November 13, 1937, the Lempertz auction house sold the works consigned to it by Dr. Stern, including the Painting (Lot 181), in auction No. 392. The sale was entitled "Die Bestände der Galerie Stern - Düsseldorf" ("Inventory of Galerie Stern - Düsseldorf") ("Lempertz/Stern Sale"). *Compl.* ¶ 17; *Bissonnette Ans.* ¶ 17; *Stern Catalogue* (*Vineberg Dec.* Ex. 4); *Excerpt from Lempertz website*, at SE00856 (*Kline S.J. Dec.* Ex. 2). *See also Auktion 392*, at SE01351 (*Vineberg Dec.* Ex. 8); *Auktion 392: Reclaiming the Galerie Stern, Dusseldorf* (Faculty of Fine Arts Gallery, Concordia University, 2006) ("Reclaiming the Galerie Stern"), at SE01410 (*Vineberg Dec.* Ex. 8).

22. Stern Estate did not know the identity of the purchaser of the Painting at the Lempertz/Stern Sale. Stern Estate also did not know that the Painting survived the War. Stern Estate also did not know the location of the Painting. *Vineberg Dec.* ¶ 24.

23. The works, including the Painting, were sold at well below market value. *Stern v. Land Nordrhein-Westfalen* at 7-9 (*Vineberg Dec.* Ex. 15).

24. Dr. Stern fled Nazi Germany for Paris in 1937. *Claim form filed by Dr. Max Stern*, December 27, 1948 (*Vineberg Dec.* Ex. 12); *Nicholas Rpt.* ¶ 7; *Order*, Jan. 26, 1938

(*Vineberg Dec.* Ex. 11). *See also Highlights* at SE00780 (*Vineberg Dec.* Ex. 3); *New York State Banking Department press release, "Painting Lost During Nazi Forced Sale Returned to Rightful Owners,"* Oct. 19, 2006, at SE01612 (*Kline S.J. Dec.* Ex. 5).

25. Upon discovering that Stern had left Germany for Paris, the government issued an order freezing his assets. *Order*, Jan. 26, 1938 (*Vineberg Dec.* Ex. 11); *Claim form by Dr. Max Stern*, dated December 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00280; *Nicholas Rpt.* ¶ 7. Thus, Dr. Stern never saw the proceeds of the Lempertz/Stern Sale.

26. At about the same time Dr. Stern escaped Germany, the Reich Chamber for the Fine Arts wrote a letter to the Gestapo, the State Police of Nazi Germany, asking it to verify that Dr. Stern was in compliance with its order. *Letter from Reich Chamber for the Fine Arts to Gestapo*, December 23, 1937 (*Vineberg Dec.* Ex. 7). *See also Reclaiming the Galerie Stern*, at SE001377-78 (*Vineberg Dec.* Ex. 8).

27. Dr. Stern left Paris to join his sister in London, just prior to the outbreak of World War II. Dr. Stern was, for the first part of the War, interned in a refugee camp on the Isle of Man as an "enemy alien." *Order*, dated Jan. 26, 1938, at SE00247 (*Vineberg Dec.* Ex. 11); *Claim form by Dr. Max Stern*, dated December 27, 1948 (*Vineberg Dec.* Ex. 12), at SE00280. *See also Highlights* at SE00780 (*Vineberg Dec.* Ex. 3).

28. Stern later emigrated to Canada, where he was interned as a "civilian alien." He was released in 1942. *Id.*

29. After his release, Dr. Stern became a preeminent Canadian art collector and dealer as head of the Dominion Gallery in Montreal. *Highlights* at SE00780-81 (*Vineberg Dec.* Ex. 3).

30. Upon his death in 1987, Dr. Stern bequeathed all residue of his estate to the Dr. and Mrs. Max Stern Foundation ("Stern Estate"). *Last Will and Testament of Dr. Max Stern* at

10-11 (*Vineberg Dec.* Ex. 9). Stern Estate primarily benefits three non-profit institutions: Concordia University in Montreal, McGill University in Montreal, and the Hebrew University of Jerusalem in Israel. *Id.*

**Bissonnette Obtains the Painting**

31. Dr. Wilharm was a physician in Germany in the 1930s and 1940s. *Compl.* ¶ 27; *Bissonnette Ans.* ¶ 27.

32. Dr. Wilharm acquired the Painting through the Lempertz/Stern Sale in which Dr. Stern's gallery was forcibly liquidated. *Stern v. Land Nordrhein-Westfalen* at 7-8 (*Vineberg Dec.* Ex. 15). He paid 3,600 marks for the Painting, plus an additional 540 marks as a commission to Lempertz. *Receipt from Lempertz auction house* (*Fusco Aff.* Ex. D).

33. Dr. Wilharm hung the Painting in the home he shared with his wife Baroness von Morsey Pickard in Germany during the War. *Fusco Aff.* ¶ 3 & Ex. B.

34. Baroness von Morsey Pickard was Bissonnette's mother. *Compl.* ¶ 30; *Bissonnette Ans.* ¶ 30. Dr. Wilharm was Defendant Bissonnette's stepfather. *Compl.* ¶ 28; *Bissonnette Ans.* ¶ 28.

35. Dr. Wilharm possessed the Painting in his private collection until he passed it to his wife Baroness von Morsey Pickard. *Bissonnette Aff.* ¶¶ 4-5; *Compl.* ¶ 46; *Bissonnette Ans.* ¶ 46.

36. Bissonnette inherited the Painting from her mother Baroness von Morsey Pickard in 1991. *Defendant Maria-Louise Bissonnette's Affidavit in Support of Her 12(b) Motion to Dismiss and/or for Stay* ("Bissonnette Aff.") ¶ 5; *Compl.* ¶ 30; *Bissonnette Ans.* ¶ 30; *Fusco Aff.* ¶ 3.

37. Bissonnette has possessed the Painting in the United States since 1959. *Letter from Schenker & Co. to Youmans [former name of Bissonnette] with shipping documents*, dated 1959 (*Kline S.J. Dec.* Ex. 8); *Fusco Aff.* Ex. A.

38. Bissonnette has resided in the United States since at least 1956. *Obituary of Dr. Karl Wilhelm*, 1956 (*Kline S.J. Dec.* Ex. 9). Bissonnette has resided in Rhode Island since at least October 1991. *Accurint report*, downloaded on June 15, 2007 (*Kline S.J.* Ex. 10).

**Stern's Efforts to Recover his Collection**

39. After the end of World War II, Stern made many efforts to find and recover his collection. *See generally Concordia University press release, "Concordia Announces the Return of an Important French Painting Lost to Max Stern During the Nazi Regime,"* Oct. 19, 2006, at SE01351 (*Vineberg Dec.* Ex. 10). Immediately after the War, he pursued and recovered paintings through the Canadian Military Mission (*Letter from Under-Secretary of State for External Affairs Canada to Stern*, March 3, 1948 (*Vineberg Dec.* Ex. 16)) and pursued further recoveries through the British military government for the British zone of occupation in post-War Germany, which zone included Düsseldorf and Cologne (*Claim form by Dr. Max Stern*, dated December 27, 1948 (*Vineberg Dec.* Ex. 12)). He also advertised several of his losses in the magazine *Canadian Art*. "A Search for Lost Paintings," *Canadian Art* (Christmas 1948), at 90-91 (*Vineberg Dec.* Ex. 14). He also placed an advertisement in *Die Weltkunst* on August 1, 1952 (*Vineberg Dec.* Ex. 18). In 1949, Stern visited Europe with his wife in an attempt to trace his lost paintings. *Letter from Secretary of State for External Affairs Canada to Doré, Canadian Ambassador to Belgium*, dated May 3, 1949 (*Vineberg Dec.* Ex. 17).

40. Later, Dr. Stern initiated proceedings in Germany for the recovery of paintings and other property seized by the Gestapo. *Claim form by Dr. Max Stern*, dated Feb. 28, 1958 (*Vineberg Dec.* Ex. 13). He also pursued claims for monetary compensation for his art losses

through the German restitution courts in the early 1960s. *Stern v. Land Nordrhein-Westfalen* (*Vineberg Dec.* Ex. 15).

41. More recently, Stern Estate contracted with Art Loss Register to assist in its search for Dr. Stern's paintings (*Letter from Art Loss Register to Stern Estate*, dated April 1, 2004 (*Vineberg Dec.* Ex. 19)) and listed the Painting on Germany's Lost Art Internet Database (*Lost Art listing* (*Vineberg Dec.* Ex. 20)). Despite these and other efforts, most of Stern's collection has not been recovered.

42. Lempertz auction house was heavily damaged in 1943 by wartime bombing (*Excerpt from Lempertz website*, at SE001246 (*Kline S.J. Dec.* Ex. 1)), and its Nazi-era records were destroyed. Post-War efforts to locate paintings from the Stern auctions were severely hindered by the near-total destruction of records that might have revealed the identities of purchasers.

43. On or about February 24, 1964, a restitution court in Germany recognized that the Lempertz/Stern Sale was a forced sale. *Stern v. Land Nordrhein-Westfalen* at 7-8 (*Vineberg Dec.* Ex. 15). The court also recognized that the paintings sold at the Lempertz/Stern Sale were owned by Dr. Stern. *Id.*

44. The court awarded Dr. Stern partial damages for his loss of profit in being forced to sell his inventory of paintings at prices that were below what he could have charged in the ordinary course of business, known as "Verschleuderungsschaden." *Stern v. Land Nordrhein-Westfalen* at 3 (SE00553) (*Vineberg Dec.* Ex. 15).

45. The court also noted that although Stern initially received some proceeds from the sales of his inventory and other business assets, the Nazi government forced him to pay excessive income and other discriminatory taxes out of those proceeds. *Stern v. Land*

*Nordrhein-Westfalen* at 5 (*Vineberg Dec.* Ex. 15); *Nicholas Rpt.* ¶ 7. Stern was unable to access any of the remaining proceeds due to a 1938 order freezing his assets. *Order*, Jan. 26, 1938 (*Vineberg Dec.* Ex. 11). Therefore, Stern took none of the proceeds of the sales out of Germany when he fled. *Claim form by Dr. Max Stern*, dated December 27, 1948 (*Vineberg Dec.* Ex. 12) at SE00280; *Nicholas Rpt.* ¶ 7.

**Stern Estate's Discovery of the Painting**

46. The Painting is in the private collection of Dr. Wilharm's stepdaughter Bissonnette. *Fusco Aff.* ¶ 2; *id.* Ex. A (*Consignment Contract between Estates Unlimited and Bissonnette*, April 21, 2003 ("Consignment Contract")) at 1 & Schedule A.

47. On or about April 21, 2003, Estates Unlimited received the Painting on consignment from Bissonnette. *Compl.* ¶ 37; *Bissonnette Ans.* ¶ 37; *Fusco Aff.* ¶ 2 & Ex. A.

48. In the Consignment Contract, Bissonnette certified as follows:

> I CERTIFY, that I am the owner and/or legal representative of the above listed goods, merchandise, and/or property and have good title and the right to sell and that they are free from all incumbrances. I agree to accept all responsibility for providing merchantable title and for delivery of title to the purchaser. . . .

*Consignment Contract* at 1 (*Fusco Aff.* Ex. A).

49. In January 2005, Stern Estate learned from the Art Loss Register ("ALR") that the Painting was on consignment to Estates Unlimited. *Rubin Dec.* ¶ 3.

50. ALR contacted Estates Unlimited, informing it that Stern Estate claimed ownership of the Painting (*Fusco Aff.* ¶ 7 & Ex. D), and requesting that Estates Unlimited withdraw the Painting from the auction. *Fusco Aff.* ¶ 8. Estates Unlimited agreed and withdrew the Painting. *Id.*

51. Estates Unlimited provided Bissonnette's identity and contact information to ALR, and informed Bissonnette of Stern Estate's claim. *Fusco Aff.* ¶ 8. Upon receiving

information from Estates Unlimited about the claim, Bissonnette told Estates Unlimited that it was "ridiculous" and "impossible." *Id.*

52. In January 2005, Stern Estate made a claim for restitution of the Painting with the Holocaust Claims Processing Office in New York ("HCPO") of the State of New York Banking Department. *Email from Korte, on behalf of Stern Estate, to Art Loss Register*, January 6, 2005 (*Fusco Aff.* Ex. D); *Rubin Dec.* ¶ 3; *Letter from Cohen to Bissonnette*, Feb. 8, 2005 (at SE00775-78) (*Rubin Dec.* Ex. A).

53. On or about February 8, 2005, acting on behalf of Stern Estate, the HCPO sent a demand letter to Bissonnette through Estates Unlimited seeking restitution of the Painting. *Rubin Dec.* ¶ 3 & Ex. A; *Fusco Aff.* ¶ 11.

54. Bissonnette refused to return the Painting to Stern Estate as demanded by the HCPO. *Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41; *Rubin Dec.* ¶ 7.

55. From February 2005 through April 2006, HCPO and Bissonnette continued a dialogue in an attempt to resolve Stern Estate's restitution claim. *Compl.* ¶ 42; *Bissonnette Ans.* ¶ 42; *Rubin Dec.* ¶¶ 3-7.

56. On or about April 19, 2006, Stern Estate learned that the Painting had been removed from this district and the United States, and sent to Germany. *U.S. Postal Service, Customs Declaration and Dispatch Note*, dated Sept. 15, 2005 (*Kline S.J. Dec.* Ex. 4); *Rubin Dec.* ¶ 7; *Letter from Cohen to Weltman*, March 30, 2006 and attached Press Release dated Mar. 23, 2006 (*Rubin Dec.* Ex. C).

57. The Court has directed Bissonnette to refrain from moving the Painting without first obtaining the prior permission of this Court. *Order*, June 12, 2007.

58. After the Painting arrived in Germany, Bissonnette obtained an appraisal of the Painting from the Lempertz auction house in the range of 50,000-70,000 Euros (approximately $67,000 to $94,000) (*Legal Action* at 10, attachment to *Bissonnette's Second 12(b) Aff.*). Also, Bissonnette attempted to sell the painting through Lempertz. *Letters from Strasoldo to Rosshoff*, dated Aug. 9 and 16, 2006 (*Kline S.J. Dec.* Ex. 6).

59. Bissonnette instituted a proceeding in Germany, asserting a claim to title and right to possession of the Painting. *Letter from Buckley to Cohen*, April 19, 2006, at 1 (*Kline S.J. Dec.* Ex. 1). Stern Estate has not been served with process in that proceeding. *Vineberg Dec.* ¶ 28. Bissonnette did not inform Stern Estate of the plans to remove the Painting from this district and the United States until after the removal was complete. *Letter from Buckley to Cohen*, April 19, 2006, at 1 (*Kline S.J. Dec.* Ex. 1); *Vineberg Dec.* ¶ 27.

60. Since acquiring it, Bissonnette has maintained possession of the Painting in her private collection. *Consignment Agreement* (*Fusco Aff.* Ex. A). Except for one exhibition in Kassel, Germany in June 1952 (*Fusco Aff.* ¶ 3; *Receipt from Der Magistrat Der Stadt Kassel*, May 9, 1952 (*Fusco Aff.* Ex. E)), the Painting has not been publicly exhibited since Wilharm's purchase in 1937.

61. Bissonnette has continued to refuse to return the Painting to Stern Estate. *Compl.* ¶ 41; *Bissonnette Ans.* ¶ 41.

Dated: June 18, 2007

*/s/ Thomas R. Kline*_____________
ANDREWS KURTH LLP
Thomas R. Kline (admitted *pro hac vice*)
thomaskline@andrewskurth.com
L. Eden Burgess (admitted *pro hac vice*)
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

*/s/ Samuel Zurier*__________
TILLINGHAST LICHT LLP
Samuel Zurier (R.I. Bar No. 3576)
szurier@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

**CERTIFICATE OF SERVICE**

I the undersigned hereby certify that on June 18, 2007, the foregoing was served by first-class U.S. mail, postage prepaid, and by certified mail on:

Maria-Louise Bissonnette
59 Park Row W
Apt. 905
Providence, RI 02903

____*/s/ Miranda Perkins*_________