# AFFIDAVIT OF STEVEN FUSCO

I, Steven Fusco, after being duly sworn, do depose and state under oath as follows:

1. I am over the age of eighteen (18) and I understand the meaning of an oath and my obligation to tell the truth pursuant thereto. I make the statements contained herein upon my own personal knowledge, except where otherwise indicated.

2. I am President of Estates Unlimited, Inc. On or about April 21, 2003 Maria Bissonnette consigned to Estates Unlimited, Inc. various items for sale at public auction. Included amongst these items was a painting by F.X. Winterhalter known as "Portrait of a Woman", also known as "Madchen aus den Sabiner Bergen". In connection with this consignment, Ms. Bissonnette certified that she was the owner of all of the items so consigned and that she had good title to and the right to sell them. She further represented that all of the items were free from all encumbrances. Attached to this Affidavit and labeled Exhibit A is the referenced consignment contract.

3. In connection with and at the time of this consignment Mrs. Bissonnette also provided to Estates Unlimited, Inc. a series of photographs, copies of which are attached hereto as Exhibit B. She represented that these photographs depicted her mother and step-father and her family home in Germany. One of these photographs shows the subject painting hanging on the wall of the Bissonnette family home. Mrs. Bissonnette related to me that the subject painting had been purchased by Mrs. Bissonnette's step-father, and the receipt she provided to me indicated that the sale price was 4,140 Reichmarks. I also learned from Mrs. Bissonnette that the painting had been shown in a public exhibition in Germany following World War II. She provided me with a receipt from Der Magistrat Der Stadt Kassel concerning this exhibition, a copy of which is attached hereto as Exhibit E.

4. The subject painting, together with the other items included in the consignment were delivered to Estates Unlimited on or about the date of the consignment, April 21, 2003.

5. Kevin Bruneau, (Vice-President of Estates Unlimited, Inc.), and I were the persons who, on behalf of Estates Unlimited, had virtually all of my firm's dealings with Mrs. Bissonnette with respect to the consignment transaction. I cannot now recall all of our discussions, but I can say there was nothing out of the ordinary in these discussions or the transaction in general until I was contacted in early January of 2005 by the Art Loss Registry. I am sure that prior to this I discussed with Bissonnette the various items that were the subject of the consignment contract. I do recall that Mrs. Bissonnette informed me that her family had owned three (3) Winterhalter paintings, and that the one being consigned was the last one to be sold.

6. The Winterhalter painting consigned to Estates Unlimited by Mrs. Bissonnette was to be auctioned at a public sale scheduled for January 6, 2005. The auction was to have taken place at Estates Unlimited, Inc.'s auction gallery located at 63 Fourth Avenue, Cranston, Rhode Island. Attached hereto as Exhibit C is the brochure created and distributed by Estates Unlimited to promote this auction. The auction was also advertised in the trade periodical "Antiques and Arts Weekly" (also known in the trade as the "Newtown Bee"). It was also advertised on Estates Unlimited Inc.'s web site.

7. Just prior to the scheduled auction Estates Unlimited was contacted by the Art Loss Registry. On January 5 and January 6 of 2005 I had a number of conversations and e-mail correspondence with individuals from the Art Loss Registry including Katie Dugdale, Sarah Jackson and David Shillingford. These communications concerned the claim of ownership to the Winterhalter painting by the Estate of Max Stern, and were rather frenetic since the painting was due to the put up for auction within twenty-four hours. Attached to this Affidavit and labeled Exhibit D, are all of the e-mails and documents that are in the possession of Estates Unlimited that relate to my firm's communications with the Art Loss Registry on or about January 6, 2005, and these documents accurately reflect my dealings with the Art Loss Registry.

8. The Art Loss Registry's representatives requested that I withdraw the Winterhalter painting from the auction. I agreed to do so, as this was, in any event, my intention once I learned of the claim of the Estate of Max Stern. I believe that I confirmed this fact to the Art Loss Registry via fax, but I cannot locate a copy of this confirmation. I promptly advised the Art Loss Registry of the identity of Mrs. Bissonnette and provided it with her address and/or telephone number. I in turn informed Mrs. Bissonnette of the claim being made and provided her with copies of all the e-mail correspondence and documents that I had received from the Art Loss Registry. Mrs. Bissonnette denied the validity of the claim of the Estate of Max Stern to the painting. She described it as "ridiculous" and "impossible", and said that her step-father had purchased the painting at auction and that she had a receipt for it.

9. In connection with my dealings with the Art Loss Registry, and on or about January 6, 2005 I learned, (as the result of an e-mail from Willi Korte that was provided to me), that after World War II a compensation claim had been filed with the German government by Max Stern, and that the subject Winterhalter painting was included as part of this compensation claim.

10. I thereafter went on the Internet and "googled" Max Stern, as a result of which I learned that the subject painting had not been seized or stolen, but that Max Stern had been ordered to sell it, along with some or all of his other inventory, and that he had received the proceeds from the this sale, and had paid taxes on these proceeds.

11. Given the foregoing facts that were in my possession, I was in no position to make a judgment as to the merits of the claim of the Estate of Max Stern to the ownership of the painting. I received an e-mail from Sarah Jackson and David Shillingford that advised me that the Estate of Max Stern would make a restitution claim with Mrs. Bissonnette. I also received from the Holocaust Claims Processing Office of the State of New York Banking Department a letter dated February 8, 2005 which was addressed to Mrs. Bissonnette but sent to me "c/o Mr. Steven M. Fusco, Estates Unlimited, Inc." at my business address. I had earlier agreed with the author of this letter, Ms. Sherri North Cohen, to forward a letter to Mrs. Bissonnette, and upon receipt of this letter I promptly did so. I understood at the time that Ms. North Cohen did not have Mrs. Bissonnette's address and so could not, at this time, communicate directly with her. I later received correspondence from the Holocaust Claims Processing Office of the State of New York Banking Department dated May 12, 2005.

I thereafter was advised by Mrs. Bissonnette that there were communications or negotiations between the Art Loss Registry and/or the Estate of Max Stern and Mrs. Bissonnette. However, neither I nor anyone else acting on behalf of Estates Unlimited was a party to any of these discussions, and we were not made aware of the substance of such discussions.

12. Following these events, Mrs. Bissonnette came to Estates Unlimited, Inc. unannounced and retrieved the subject painting. I am not certain when this occurred, but I believe it was about eight (8) to ten (10) months after the scheduled auction. I was not present at the time, but based on the conversations I previously had with Mrs. Bissonnette, as well as my thorough inquiry of all other employees of Estates Unlimited, I can state with complete certainty that at no time did Mrs. Bissonnette state or infer that she intended to remove the subject painting from the United States. In fact, based on these conversations I can affirmatively state at no time did Mrs. Bissonnette ever relate to me or to any staff member of Estates Unlimited what her intentions were with respect to where the painting would be kept or what would be done with it.

13. I had previous dealings with Mrs. Bissonette, having purchased various objects d'art from her for resale in an antique business I previously operated. I have reviewed the list attached hereto as Exhibit F. To the best of my recollection and belief, none of the paintings listed in Exhibit F were involved in any way, at any time, in my dealings with Mrs. Bissonette. However, at the time of my involvement in these previous dealings, Mrs. Bissonnette happened to show me the catalogue from the auction house, (I believe the Lempertz Gallery), that had handled the sale of the Stern Gallery paintings. I did not know anything about the Stern Gallery at the time, or the circumstances surrounding the consignment of the Stern Gallery paintings shown in the catalogue. I do not know what happened to this catalogue.

14. I have attached to this affidavit copies of all documents relevant to this matter that are in the possession of Estates Unlimited. There is one document that I know exists but which is not in my possession or cannot be located. That is, the fax confirmation sent to Art Loss Registry that the painting would be withdrawn from sale.

15. Set forth above are the events concerning this matter that I can presently recall. I cannot, of course, swear that there are no additional facts that I might later recall, and detailed questioning on this matter could very well cause me to remember further details.

16. Estates Unlimited agrees that its attorney, Kevin F. Bowen, is authorized to accept service of notice of depositions and subpoenas on behalf of Estates Unlimited, Inc. and its officers. It further agrees that it will produce its officers to testify at trial in accordance with the trial court's schedule. Estates Unlimited, Inc. further agrees to use its best efforts to obtain the cooperation of its employees or any former employees in submitting to an examination by deposition and testifying at trial. Estates Unlimited further represents that any then-current employee of Estates Unlimited who fails to cooperate in this regard will be terminated from employment with Estates Unlimited, Inc.

Subscribed and sworn to under the pains and penalties of perjury this 12th day of June, 2007.

STEVEN FUSCO

Then personally appeared the above named Steven Fusco, known to me, and after being duly sworn did depose and state under oath that the foregoing was true and accurate and that his signature subscribed hereunto was his free act and deed.

Notary Public
My Commission Expires:

Kevin F. Bowen
Notary Public of Rhode Island
My Commission Expires 9/5/2010