IN THE UNITED STATES DISTRICT COURT
FOR THE STATE OF RHODE ISLAND

Max Stern Estate,
Plaintiff,

vs Civil Act. No. 06-211 (ML)

Maria-Louise Bissonnette, et al.
Defendants.

**DECLARATION AND EXPERT REPORT OF DR. ULF BISCHOF**

Dr. Ulf Bischof deposes and certifies, as follows:

**1.** I am an attorney (Rechtsanwalt) duly admitted to practice law in the Federal Republic of Germany and a partner in the Berlin law firm of Bischof & Paetow with offices at Schwedter Strasse 9A, 10119 Berlin, Germany. I make this Declaration in support of the Plaintiff to explain principles of German law that would apply to this case and to respond to the declarations of Joachim Rosshoff of January 25th 2007 and Dr. Arno Saathoff of January 31st 2007, and to comment on the defendant Maria-Louise Bissonette's Request for Admissions of January 30th 2007 as far as German law is concerned.
My compensation in this matter is based on working time on a rate of 200 Euro per hour.

**2.** In regard to my expertise I would like to refer to my earlier declaration to this court dating from December 13th 2006. I would like to add that only recently I finished an article for the Technical University of Dresden on collectors in dictatorships and moderated on April 24th 2007 a panel on legal problems at the international conference of the Moses Mendelssohn Centre at Potsdam: "A Debate without End – Looted Art and Restitution".

**3.** I have reviewed and am generally familiar with the complaint in this lawsuit brought by the Estate of Dr. Max Stern to recover a painting entitled "Mädchen aus den Sabiner Bergen" ("Girl from the Sabiner

Mountains") from Maria-Louise Bissonnette whose stepfather, Dr. Karl Wilharm, purchased the painting at an auction held by the Lempertz auction house in Cologne, Germany in 1937 based on the allegation that Nazi authorities forced Dr. Stern to sell the painting.

**4.** Those statements to be given by me are based on:

a) The declaration and expert report of Lynn H. Nicholas of December 28th 2006, of which I have a copy,

b) The declaration of Joachim Rosshoff of January 25th 2007, of which I have a copy,

c) The defendant's Maria-Louise Bissonette's request for admissions of January 30th 2007, of which I have a copy,

d) The declaration of Dr. Arno Saathoff of January 31st 2007, of which I have a copy,

e) The decision by the Higher District Court (Landgericht) Düsseldorf from February 24th 1964 in the matter Dr. Max Stern, vs Land Nordrhein-Westfalen, 26 O (Entsch) 452/62, of which I have a copy.

**5. Under German law replevin claims are time barred after 30 years at the latest.**

With reference to my earlier declaration to this court dating from December 13th 2006 and the declaration of Joachim Rosshoff of January 25th 2007 (point 5) I would like to state introductory, that a replevin claim in Germany is statute barred after 30 years at the latest. I have pointed to the relevant provision of § 197 section 1 number 1 BGB in my earlier declaration to this court and so has my colleague Dr. Arno Saathoff in his declaration to this court of January 31st 2007 (point 8). Dr. Saathoff states incorrect, though, that "the entitlement of the rightful owner to reclaim possession from the unlawful possessor" based on § 985 BGB is limited to 10 years now (see point 8 of his declaration). The provision of the German civil code in force (§ 197 section 1 number 1 BGB) however, clearly provides for 30 years and not 10 years as Dr. Saathoff declares to this court. The provision in force reads:

"§ 197 30-year limitation period

(1) Save in so far as otherwise provided, the limitation period is 30 years in the case of:

1. claims for surrender based on property or other rights in rem,

2. ..."

Thus the absolute time barrier for such replevin claims has not changed with the reform of the German Civil Code (BGB) which entered into force on January 1st 2002 (not 2001 as Dr. Saathoff suggests by stating, that the old provision was in force until December 31st 2000 - see point 8 of his declaration).

Since these are simple mistakes by Dr. Saathoff he would certainly admit to after double checking the applicable law, and the statute of limitations as such is not in question for a replevin claim based on the German Civil Code (BGB), I refrain from further commenting on these points.

As far as the important Allied restitution laws are concerned, the statutory time an applicant could file a claim for restitution in kind in the different occupied zones in Germany after the Second World War was much shorter. For the first and ground breaking US Military Law No. 59[1] (US Law No. 59) in the American occupied zone for example, filings of such restitution claims were time barred after December 31st 1948 already (US Law No. 59, article 56), in the British occupied zone and Berlin (West) after June 30th 1950 (the corresponding restitution laws in the British zone[2] and Berlin (West)[3] articles 48 respectively 50).

Subsequently a replevin claim following law applicable in Germany would be statute barred today no matter on which legal grounds such a claim would be based.

**6. Under German law it is legally impossible for a thief to acquire good title or to pass good title.**

Further I would like to address one fundamental misconception by the defendant in connection with German statutes of limitations, especially the ultimate period of 30 years as prescribed in § 197 section number 1 of the German Civil Code (BGB). When such a statute of limitations applies in Germany, this prevents the claimant to pursue a claim – such a claim is time barred.
However, and on this point the defendant is incorrect, this does not mean that a claimant legally looses title in connection with a replevin based on § 985 of the German Civil Code (BGB) for example or a third

[1] Gesetz Nr. 59 vom 10. November 1947 der Militärregierung Deutschland – Amerikanisches Kontrollgebiet –Rückerstattung feststellbarer Vermögensgegenstände, Amtsblatt der Militärregierung in Deutschland – Amerikanisches Kontrollgebiet – Ausgabe G vom 10. November 1947, S. 1. This was amended later twelve times; in addition eleven implementation decrees were issued.

[2] Gesetz Nr. 59 vom 12. Mai 1949 der Militärregierung Deutschland – Britisches Kontrollgebiet – Rückerstattung feststellbarer Vermögensgegenstände an Opfer der nationalsozialistischen Unterdrückungsmaßnahmen, Amtsblatt der Militärregierung Deutschland – Britisches Kontrollgebiet – Nr. 28, S. 1169. This was amended later three times; in addition twelve implementation decrees were issued.

[3] Anordnung BK/O (49) 180 vom 26. Juli 1949 der Alliierten Kommandantur Berlin – Rückerstattung feststellbarer Vermögensgegenstände an Opfer der nationalsozialistischen Unterdrückungsmaßnahmen, VOBl. für Groß-Berlin Teil I 1949, S. 221. This was later amended especially by Anordnung BK/O (54) 15 vom 15. November 1954, GVBl. für Berlin 1954, S. 642.

party would gain title due to the statute of limitations. Thus such a statute of limitations is a procedural argument a defendant could raise when confronted with a claim in Germany (a so called "rechtshemmende Einrede" - a permanent suspension in the pursue of a right which follows from § 214 section 1 of the German Civil Code – BGB) but has no legal effect on the underlying legal right itself, that is, it does not affect the title or the transfer of title. The defendant's requests for admissions in this case dating from January 30th 2007 points 28 to 31 show the defendant's misconception of the German statute of limitations in that regard. I will only briefly comment on the defendant's requests 28 and 29 here:

a) 28. That under German law a thief can pass good title.

This statement is misleading and legally incorrect because the thief of stolen property can never and under no circumstances acquire good title to this stolen property in the first place under German law. I would like to point to Dr. Saathoffs declaration of January 31st 2007 here (point 8), who holds the same opinion.

Generally German law does not allow transfer of title of stolen or unlawful disappropriated property (see § 935 section 1 of the German Civil Code - BGB).

b) 29. That under German law, a thief can pass good title to a painting or other article after thirty years from the time he/she acquired the object.

Again, the fact that the rightful owner of such stolen property – no matter of what kind - is prevented from pursuing a claim in a German court after 30 years as result of the statute of limitations does not mean that title passes to the thief under German law after those thirty years are elapsed. The thief never acquires good title throughout his life. Subsequently good title cannot derive from him in regard to third parties.

**7. Allied restitution law is part of German law and is applicable when legally qualifying transaction between 1933 and 1945 under German law.**

Before reverting to the nature of the loss of the painting in question for Dr. Max Stern in 1937 I would like to clarify the legal system and terminology as far as the present claim and the law applicable in Germany is concerned, too. When we talk about German law here in connection with a claim for

restitution in kind and the legal qualification of the transaction in 1937 two codices are principally of relevance – (1) the German Civil Code and (2) Allied restitution law.

We always refer to "Allied restitution law" but this judicial codex was and is applicable law in Germany to a claim that is not time barred. Hence it was not only applicable in the interim of 1945 to 1949[4] - thus the time the Allies administered Germany after victory in 1945 until the constitution of the new West German State in 1949 and West Germany's full sovereignty in 1955 - but stayed principally in force (see article 3 section 1 of the third part of the so called Treaty of Transition – Überleitungsvertrag[5] - affirmed by the Paris Protocol of October 23rd 1954, which entered into force on May 5th 1955[6]. The German Federal Court of Justice, as Dr. Saathoff confirms, too (see point 5 of his declaration, where he uses the term "German High Court"), decided - as I will point out in detail below - that Allied restitution law has to be regarded as lex specialis to the German Civil Code (BGHZ 10, 340) as far as determining the legal qualification of transactions following persecution during the Nazi era is concerned.

Subsequently the terminus "German law" has to be defined as "applicable law in Germany" especially from 1949 onwards and does not only refer to the German Civil Code (BGB) as could be easily misunderstood. It does not matter who created this law, who was the legislature, as long as the German State applied and applies certain regulations. This legal question does not occur in many countries and is a direct result from our history until 1945.

---

[4] To be more precise as far as the Allied restitution laws are concerned between November 10th 1947 when US Military Law No. 59 entered into force together with the restitution law in the French occupied zone (Verordnung Nr. 120 - VO Nr. 120 - vom 10. November 1947 der Militärregierung Deutschland – Französisches Kontrollgebiet – über die Rückerstattung geraubter Vermögensgegenstände, Amtsblatt des französischen Oberkommandos in Deutschland Nr. 119 vom 14. November 1947, S. 1219, later amended five times: Verordnungen - No. 156, 158, 213, 268, 274; followed by the restitution law in the British occupied zone on 29th April 1949 and the joint restitution law by the Allies concerning the Western part of Berlin, which was issued on July 26th 1949.

[5] Treaty of Transition dating from May 26th 1952 in the amended version based on list IV to the Paris Protocol concerning the ending of the occupational status for Western Germany signed on October 23rd 1954 (Vertrag zur Regelung aus Krieg und Besatzung entstandener Fragen - Überleitungsvertrag – vom 26. Mai 1952, in der gemäß Liste IV zu dem am 23. Oktober 1954 in Paris unterzeichneten Protokoll über die Beendigung des Besatzungsregimes in der Bundesrepublik Deutschland geänderten Fassung, BGBl. 1955 II S. 405).

[6] Law concerning the Paris Protocol of October 23rd 1954 concerning the ending of the occupational status for Western Germany (Gesetz betreffend das Protokoll vom 23. Oktober 1954 über die Beendigung des Besatzungsregimes in der Bundesrepublik Deutschland vom 24. März 1955, BGBl. 1955 II S. 213).

**8. It is my opinion that the sale of the painting in question at Lempertz auction house in 1937 constitutes a confiscation under applicable German law. In the context of Dr. Stern's claim in this case Dr. Wilharm did not receive title to the painting.**

To qualify the loss of the painting for Dr. Max Stern in 1937 legally, Allied restitution law is lex specialis to the German Civil Code (BGB) (decision by the Federal Court of Justice, Bundesgerichtshof BGHZ 10, 340). In his declaration from January 31st 2007 Dr. Saathoff holds the same opinion (see point 5 with reference to the above cited decision of the German Federal Court of Justice – Bundesgerichtshof BGHZ 10, 340 - or "German High Court" as Dr. Saathoff chooses to translate "Bundesgerichtshof"). Therefore it is only consequent to apply those rules and regulations following from Allied restitution law to the present case. It is inconsistent by Dr. Saathoof to admit to the fact that Allied restitution law is lex specialis to the German Civil Code (BGB) (point 5 of his declaration) and then to qualify the transaction in question and argue the case entirely along the German Civil Code (points 3, 4, 6, 7, 8 of his declaration), since by definition lex specialis controls over general legal principles.

The fact that a German court (the Higher Regional Court of Berlin "Kammergericht" on October 29th 1946) refers to a contestation rule of the German Civil Code (§ 123 BGB) in that regard in connection with the qualification of a 1939 transaction (the forced sale of real estate by a Jewish land owner) is only seemingly a contradiction to the primacy of Allied restitution law – Dr. Saathoff cites this judgment when referring to "KG SJZ 47, 257" under point 4 of his declaration. In 1946, when the Higher Regional Court of Berlin decided over the 1939 transaction, Allied restitution law was simply not in force yet. US law No. 59 for example was issued on November 10th 1947 only, and therefore the question of Allied restitution law constituting lex specialis to the German Civil Code did not occur in 1946 yet.[7]

[7] The second judgment Dr. Saathoff refers to (BAG RzW 1959, 502) is a judgment by the Federal Labor Court from March 23rd 1959 in connection with the review of a 1933 working contract by a Jewish claimant which the court found was not terminated because of persecution. That is why the court stated that besides seeking compensation on the basis of the Federal Compensation Law (BEG) here the plaintiff could revert to general civil law principles but stated at the same time that general principles of justice as contained in § 123 BGB and §138 BGB could not appropriately be applied to the situation the Jewish claimant found himself in in 1933. There was – unlike in the present case – no question of property or restitution in kind involved and therefore no reference to the Allied restitution law made in that regard. The third reference Dr. Saathoff makes is an entry in one commentary to the German Civil Code – Palandt/ *Heinrichs* BGB, § 123 Rn. 18, which simply cites the two decisions by the Higher District Court of Berlin and the Federal Labor Court I referred to above.

One remark to the historic context – the legal problem of applying general civil law principles as prescribed in the German Civil Code (which entered into force on January 1st 1900 and with minor modifications is still in force today) to the time of Nazi dictatorship between 1933 and 1945, especially in regard to transactions involving Germany's Jewish population, was seen immediately after the war. It was concluded that under no circumstances does the German Civil Code constitute an appropriate instrument to legally qualify such transactions. The German Civil Code did and does of course contain provisions concerning unlawful disappropriated property. But the persecution especially of the Jewish population created such exceptional situations and extreme circumstances, threats to life and pressure to enter into legal transactions, to which the "ordinary" German Civil Code could simply not respond, because the creators of the German Civil Code at the time the German Emperor was still in power around 1900 had certainly not envisaged such times of "legal disorder" but rather provided for rules in connection with simple thefts etc. which occur at all times.

Already the Higher Regional Court of Berlin in 1946 (see the above cited decision, KG SJZ 47, 257) applied provision § 123 of the German Civil Code (BGB) in a way German courts had never done before in German law history. The court decided that the general threat to life and property of a Jewish vendor due to Nazi persecution to sell his real estate in 1939 was of such significance, that although the Jewish vendor seemingly entered "voluntarily" in this transaction from the buyer's perspective at the time of the sale, and the buyer individually had not imposed pressure on the vendor to sell, the vendor's sale constituted a forced sale and was therefore ultimately void.[8] While the legal outcome of this case seemed appropriate, the judgment was really "bending" the relevant provision of the German Civil Code to achieve this legal result. Already the publication of the decision itself (KG SJZ 47, 257) in 1947 is accompanied by an annotation of the well known scholar *Walter Schwarz*, which commences:

[8] In regard to the German Civil Code - during the Nazi era disappropriated objects would have to be seen as lost in the meaning of § 935 section 1 of the German Civil Code (BGB) as it is the case for stolen property for example, since the persecuted vendor only seemingly entered voluntarily in the transaction leading to the loss. A contestation following § 123 of the German Civil Code (BGB) would not be needed since the transaction would be void without contestation because of its contra bonos mores character, a principle the German Civil Code contains in § 138 BGB, too. However, as shown above, this is only an additional and theoretic remark, since the German Civil Code is not the appropriate instrument in legally qualifying such transactions between 1933 and 1945.

"The judgment of the Higher Regional Court tries with the means available to the present civil law to do justice to a factual situation, which needs to be addressed by the legislative body as most pressing, difficult and unthankful task of current German legal politics..."[9]

The Allied restitution laws were the legal answer to this situation. A legal body was created which took account of the terrible events and responded - at least in most parts - appropriately to the legal challenge. The German Civil Code was no longer the applied legal standard to qualify such transactions in connection with persecution between 1933 and 1945. When Germany was reunited in 1990 and indemnification became possible for the first time after 1945 in East Germany[10] the specialty of the provisions contained in Allied restitution law – here with reference to the cited Allied restitution law for Berlin (West) BK/O (49) 180 of the Allied Kommandatura of Berlin of July 26th 1949[11] - as far as the qualification of relevant transactions between 1933 and 1945 was concerned was confirmed in § 1 section 6 of the relevant Property Law (Vermögensgesetz)[12].

The provisions and legal criteria of the US Law No. 59, the British Law No. 59[13] and the Allied restitution Law for Berlin (West)[14] are almost similar. For reference reasons I will revert to US Law No. 59 and relevant decisions based upon this law since it was the groundwork for the restitution laws in the British zone and Berlin (West).

<u>The legal qualification of the sale of the painting in question at Lempertz auction house in 1937</u>

To qualify this transaction I would at first like to refer to the following provisions from US Law No. 59:

---

[9] *Walter Schwarz* Anmerkung zu KG SJZ 47, 257; in SJZ 47, 263.

[10] A need for restitution or compensation for losses between 1933 and 1945 was never recognized in communist East Germany before reunification due to the approach that East Germany had nothing to do with the Nazi era and therefore did not need to take care of any such claims...

[11] BK/O (49) 180 of the Allied Kommandatura of Berlin of July 26th 1949, VOBl. für Groß-Berlin I S. 221. See above footnote 3.

[12] Vermögensgesetz in der Fassung der Bekanntmachung vom 9. Februar 2005 (BGBl. I S. 205), zuletzt geändert durch Artikel 4 des Gesetzes vom 19. Dezember 2006 (BGBl. I S. 3230).

[13] See footnote 2.

[14] See footnote 3.

*Law No. 59*
*Restitution of Identifiable Property*

*Article 1*
*Basic Principles*

*1. It shall be the purpose of this Law to effect to the largest extent possible the speedy restitution of identifiable property (tangible and intangible property and aggregates of tangible and intangible property) to persons who were wrongfully deprived of such property within the period from 30 January 1933 to 8 May 1945 for reasons of race, religion, nationality, ideology or political opposition to National Socialism. ...*

*2. Property shall be restored to its former owner or to his successor in interest in accordance with the provisions of this Law even though the interests of other persons who had no knowledge of the wrongful taking must be subordinated. ...*

*Article 2*
*Acts of Confiscation*

*1. Property shall be considered confiscated within the provisions of this Law if the person entitled thereto has been deprived of it, or has failed to obtain it despite a well founded legal expectancy of acquisition, as the result of:*

*a) A transaction contra bonos mores, threats or duress, or an unlawful taking or any other tort;*

*b) Seizure due to a governmental act or by abuse of such act;*

*c) Seizure as the result of measures taken by the NSDAP, its formations or affiliated organizations;*

*provided the acts described in a) to c) were caused by or constituted measures of persecution for any of the reasons set forth in Article 1.*

*2. It shall not be permissible to plead that an act was not wrongful or c o n t r a b o n o s m o r e s because it conformed with a prevailing ideology concerning discrimination against individuals on account of their race, religion, nationality, ideology or their political opposition to National Socialism ...*

*Article 3*

*Presumption of Confiscation*

*1. It shall be presumed in favor of any claimant that the following transactions entered into between 30 January 1933 and 8 May 1945 constitute acts of confiscation within the meaning of Article 2:*

*a) Any transfer or relinquishment of property made during a period of persecution by any person who was directly exposed to persecutory measures on any of the grounds set forth in Article 1;*

*b) Any transfer or relinquishment of property made by a person who belonged to a class of persons which on any of the grounds set forth in Article 1 was to be eliminated in its entirety from the cultural and economic life of Germany by measures taken by the State or the NSDAP.*

*2. In the absence of other factors proving an act of confiscation within the meaning of Article 2, the presumptions set forth in paragraph 1 may be rebutted by showing that the transferor was paid a fair purchase price. Such evidence by itself shall not, however, rebut the presumptions if the transferor was denied the free right of disposal of the purchase price on any of the grounds set forth in Article 1.*

*3. A fair purchase price within the meaning of this Article shall mean the amount of money which a willing buyer would pay and a willing seller would take, taking into consideration, in the case of a commercial enterprise, the normal good will which such enterprise would have in the hands of a person not subject to persecutory measures referred to in Article 1.*

*Article 4*

*Power of Avoidance*

*1. Any transaction entered into by a person belonging to a class referred to in paragraph 1 b) of Article 3 within the period from 15 September 1935 (the date of the first Nürnberg laws) to 8 May 1945 may, because of the duress imposed on such class, be avoided by a claimant where such transaction involved the transfer or relinquishment of any property unless:*

*(a) The transaction as such and with its essential terms would have taken place even in the absence of National Socialism, or*

*(b) The transferee protected the property interests of the claimant (Article 7) or his predecessor in interest in an unusual manner and with substantial success, for example, by helping him in transferring his assets abroad or through similar assistance.*

...

Applying these principles to the present case:

**a)** The Painting in question is identifiable property in the meaning of art. 1 section 1 US Law No. 59.

**b)** It is to my belief undisputed between the parties to the present case, too, that Dr. Max Stern, because of his Jewish religion, belonged to the class of persons as described in art. 3 section 1 b) US Law No. 59.

**c)** Subsequently, the law would regard the painting as confiscated,

> **aa)** if Dr. Max Stern lost the painting as a result of a transaction contra bonos mores, as a result of threats or duress, or an unlawful taking or any other tort... (art. 2 section 1 a) US Law No. 59) provided this transaction had its ultimate cause in the persecution of Dr. Max Stern because of his Jewish religion (art. 2 section 1 at the end US Law No. 59), or
>
> **bb)** such a confiscation would be presumed for the sale of the painting at Lempertz (art. 3 section 1 US Law No. 59) because it took place after January 30th 1933 and before May 8th 1945. The latter presumption of confiscation could only be rebutted by the defendant by showing
>
> > **(1)** that Dr. Max Stern was paid a fair purchase price and (cumulative)
> >
> > **(2)** that Max received this purchase price to his free disposal
> > (art. 3 section 2 US Law No. 59)

and because of the timing of the Lempertz sale being after September 15th 1935 and before May 8th 1945, again cumulative

**(3)** that Dr. Max Stern would have sold the painting in question to the same essential terms at Lempertz even in the absence of National Socialism (art. 4 section 1 a) US Law No. 59).[15]

For further reference I would like to draw the courts attention to a decision, which – besides many others – refers to the application of the above described legal principles. The decision was made by the United States Courts of the Allied High Commission for Germany – here the highest instance, the Court of Restitution Appeals (CORA) in *Katharina Hellmann, Elsa Mohr, Konrad Hellmann, vs Heilig-Geist-Spitalstiftung* CORA opinions, volume I, 1951, opinion no. 23, page 143. I will attach a copy of this decision to this declaration as appendix 1.

**d)** After Lynn Nicholas' declaration of December 28th 2006 to this court and all that is known about the faith of Dr. Max Stern today, Dr. Max Stern was exposed to severe pressure and threat at least to his socio-economic life at the time of the sale in 1937 which would as such be sufficient to assume a direct threat in the meaning of art. 2 section 1 US Law No. 59 which led to the sale of the painting at Lempertz. Dr. Max Stern was forced to shut his gallery due to orders which aimed at excluding him from running his art gallery, subsequently earning his living, only because of his Jewish religion. There can be no doubt that the sale of the remaining paintings at Lempertz in 1937 including the painting in question is a direct consequence from this situation and does therefore by law constitute a confiscation of the painting in question following art. 2 section 1 a) US Law No. 59 (for a transaction resulting from threat and duress in that regard see for example in *Georg Poehlmann, vs Kulmbacher Spinnerei AG* CORA opinions, volume III, 1953, opinion no. 285, page 711).

**e)** In any event the painting in question would likewise be regarded as confiscated under US Law No. 59 because the sale at Lempertz would constitute a relevant transaction of the Jewish art dealer Dr. Max

---

[15] The exception of art. 4 section 1 b) US Law No. 59 is of no relevance to this case because there is no factual background which would support the idea that Dr. Wilharm protected the property interests of Dr. Max Stern in an unusual manner and with substantial success, for example helping Dr. Max Stern in transferring his assets abroad etc. The standard in this regard is very high and Dr. Wilharm did everything else but helping Dr. Stern.

Stern between January 30th 1933 and May 8th 1945 as prescribed under the presumption of art. 3 section 1 US Law No. 59.

While discussing whether this presumption can be rebutted we do not have to decide over the question if the purchase price paid for the painting in question at Lempertz was fair and received by Dr. Max Stern at his free disposal (art. 3 section 2 US Law No. 59) because the sale at Lempertz took place after the decisive date of September 15th 1935 and before May 8th 1945 and therefore it would need to be proven cumulative by the defendant here, that Dr. Max Stern would have sold the painting even without being persecuted by the National Socialist regime.

In regard to transactions after September 15th 1935 and the application of especially art. 4 section 1 US Law No. 59 I refer for example to the decision of the Court of Restitution Appeals in *August and Elisabeth Schulz, vs Emanuel and Jettchen Rosenthal* (attached as appendix 2; see as well *Michael and Anna Busl, vs Julius and Frieda Waldmann* CORA opinions, volume I, 1951, opinion no. 40, page 296; further *Hildegard Dietz, vs Julius May* CORA opinions, volume II, 1952, opinion no. 134, page 493; *Hildegard Martin, Herta Hilpp, Heinz Martin, Dr. Carl Rohleder (as curator), vs Albert Reyburn* CORA opinions, volume II, 1952, opinion no. 135, page 496; *Leo Schroeder, vs Nathan Scheinmann, Jakob Thorn* CORA opinions, volume II, 1952, opinion no. 145, page 558; *Beatrix Boden, vs Dr. Hans and Anny Barth* CORA opinions, volume II, 1952, opinion no. 151, page 618 – etc.).

In the present case the defendant has himself requested for admissions on January 30th 2007:

in point 2
"That the delivery of the subject painting and other paintings by Dr. Max Stern, to Lempertz in 1937 was because Dr. Stern was forced to give up his occupation as an art dealer in Germany, as he was Jewish."

and in point 7
"...that the sale of paintings was a forced sale."

Subsequently it is undisputed that Dr. Max Stern would never have entered this sale without him being persecuted by the Nazi authorities. Therefore the sale of the painting in question does constitute in any event a confiscation in the meaning of art. 3 US Law No. 59.

**f)** I will briefly comment on some points regarding the request for admissions by the defendant from January 30th 2007 in connection with the above expressed opinion in regard to German law:

All remarks in regard to the purchase price are irrelevant to the present case as far as German law is concerned because the defendant does admit that the sale at Lempertz was due to persecution of Dr. Max Stern.
For this reason it does not matter who made up the price for the sale (point 3); that the minimum price might have been 4000 RM (point 4), that Dr. Max Stern might have received 4,140 RM (point 5); that the proceeds of the sale might have been transferred to an account of Dr. Max Stern (point 6); that Dr. Wilharm might have paid a fair and reasonable price for the painting (point 8).

As far as points 7, 9, 24, 25 are concerned in regard to German law: Dr. Wilharm's knowledge concerning Dr. Max Stern's situation is irrelevant, too, because the illegal character of such a sale, the threat and duress amounting to confiscation for the victim does exclusively depend on the transferor, Dr. Max Stern in our case. Even if the buyer would have been Jewish or – other than Dr. Wilharm with his firm ties to the NS regime – a victim of National Socialist persecution himself, this buyer would be obliged to restitute a confiscated object if this buyer could not rebut the presumption of confiscation following art. 3 and 4 of US Law No. 59 (see for example *Erwin Julius Koppel, vs Fritz Ettlinger, Walter Brueggemann, Hermann Brueggemann, Dr. Erich Haasis et al.* CORA opinions, volume II, 1952, opinion no. 164, page 700 - which I enclose in copy as appendix 3). This presumption can only be rebutted by the means prescribed by law. Lack of knowledge by the buyer is not recognized here.

The same principle would apply in connection to point 11 of the defendant's request. I am assuming the Lempertz sale was open to everyone – except maybe Jewish buyers – but it took place in the NS era and as far as Dr. Max Stern is concerned, and only that is of legal relevance to this case under German law, certainly did not constitute a regular type of auction but illegal confiscation of his property due to Nazi persecution.

Points 12 and 14 of the defendant's request are hypothetical, inappropriate given the historic background and of no legal relevance to the present case in regard to German law because the defendant does admit that the Lempertz sale in 1937 was a forced sale for Dr. Max Stern. What Dr. Max Stern could or could not have done years before does not matter under German law in my view.

The fact that Dr. Max Stern - in regard to point 13 of the defendant's request for admissions – could save his life and was able to emigrate in late December 1937, hence after the sale at Lempertz, is of no relevance when qualifying the loss of the painting under German law, because Max Stern was Jewish and the transaction took place in Germany between September 15th 1935 and May 8th 1945, which is undisputed between the parties.

**9. Under German law from the fact that Dr. Max Stern was awarded a dissipation compensation under Germany's Federal Compensation Law (Bundesentschädigungsgesetz - BEG) in 1964, it can not be concluded that Dr. Stern had no valid claim for restitution in kind under the Allied restitution laws or made a choice of remedies in regard to the confiscation of his property in 1937.**

Finally I would like to comment on the question of Dr. Max Stern seeking compensation on the basis of the Federal Compensation Law (Bundesentschädigungsgesetz[16]), which was awarded to him in 1964.

First of all, in regard to Dr. Arno Saathoff's declaration to this court of January 31st 2007 I would like to clarify that compensation in this case was based on the Federal Compensation Law (Bundesentschädigungsgesetz, short BEG). When Dr. Saathoff declares (point 5 of his declaration) that "Germany has issued restitution laws according to which persons having suffered losses due to nazi-treatment had to receive compensation from the government", this falls somewhat short and is misleading.

After the war West Germany enacted two indemnification laws of principle relevance to the present case which dealt with confiscation and dissipation due to Nazi persecution. None of these two laws provided for a restitution in kind. Restitution in kind was possible only on the basis of the Allied restitution laws as described above (see point 8).

The first indemnification law was the so called Federal Restitution Law (Bundesrückerstattungsgesetz[17], short BRüG), which awarded – despite of its title – only compensation for confiscations (in the meaning

[16] Bundesentschädigungsgesetz in der im Bundesgesetzblatt Teil III, Gliederungsnummer 251-1, veröffentlichten bereinigten Fassung, zuletzt geändert durch Artikel 7 Abs. 4 des Gesetzes vom 26. März 2007, BGBl. I S. 358.

[17] Bundesgesetz zur Regelung der rückerstattungsrechtlichen Geldverbindlichkeiten des Deutschen Reiches und gleichgestellter Rechtsträger vom 19. Juli 1957, BGBl. I S. 734.

of the Allied restitution laws) which had been directly executed by the Nazi State and its organizations (for example a seizure of a Jewish art collection by the Gestapo). Were objects lost and could therefore not be restituted on the basis of the Allied restitution laws a compensation was paid to the victim.
In the present case there was no direct execution of the confiscation by the Gestapo and so on, therefore Dr. Max Stern could not touch compensation under this law.

The second indemnification law was the cited Federal Compensation Law (Bundesentschädigungsgesetz, short BEG), which awarded an only limited compensation especially in cases, where the victim was forced to leave the country and had left behind his interior or was forced to sell his interior or entire collection all at once, not having the appropriate time to look for individual buyers for individual pieces of art like in the case of Dr. Max Stern for example. In many cases "former" belongings of the victims were simply lost after the war or were unidentifiable pieces of refurbishment etc. Often Jewish people had to escape over night. They were for many reasons – rules and regulations for Jewish people emigrating, immediate threats, shortage of funds etc. - not able to take things abroad. In the case of Dr. Max Stern, he was forced to sell the paintings all at once under pressure. The Higher District Court (Landgericht) of Düsseldorf in its decision from February 24th 1964 - 26 O (Entsch) 452/62 – recognized that this transaction constituted dissipation. "The true value of paintings was much higher than the proceeds of the sale"[18] - the court concluded and awarded a small compensation.
However, this does in no way influence Dr. Max Stern's claim for restitution in kind. Thus the fact, that a dissipation damage was recognized by the German court does not mean that Dr. Max Stern would not have had a claim for restitution in kind under Allied restitution law. Dr. Max Stern was simply not in a position to make such a claim at the time because his paintings were dispersed and could not be located due to the lack of documentation. There was no one from whom he could have claimed his painting back on the basis of US Law No. 59 for example. The only thing left to Dr. Max Stern was therefore a minimum dissipation award under the Federal Compensation Law (BEG).

The German Federal Court of Justice (Bundesgerichtshof) acknowledged in a decision of July 7th 1956:

"If the persecuted person has suffered damage to his property, because he was forced to sell objects belonging to his property due to persecution below the appropriate value by means of public auction

[18] Page 8 of the cited decision of the Higher District Court (Landgericht) Düsseldorf from February 24th 1964 in the matter Dr. Max Stern, vs Land Nordrhein-Westfalen, 26 O (Entsch) 452/62.

(dissipation damage), this person does have an indemnification claim on the basis of § 56 BEG, if this damage cannot be made up for by the means of the restitution laws."[19]

Subsequently in the latter cases, such as the confiscated painting from the property of Dr. Max Stern, a compensation claim under the Federal Compensation Law was possible besides a – in principle valid, in practice due to the lack of knowledge and documentation concerning the whereabouts of the confiscated property not executable – claim for restitution in kind under the Allied restitution laws. Therefore it must be concluded that the decision of the Higher District Court (Landgericht) of Düsseldorf from February 24th 1964 - 26 O (Entsch) 452/62 - does have no legal impact on the question, if Dr. Max Stern had a valid claim for restitution in kind of Franz Xaver Winterhalter's "Girl from Sabiner Mountains" under the relevant Allied restitution law.

Where the defendant requests for admission (on January 30th 2007, point 18) that Dr. Max Stern in pursuing a compensation claim before the Düsseldorf Court in 1964 made an election of remedies regarding the subject painting, the defendant is therefore legally incorrect and shows little understanding about the difficulties of indemnification.

As far as point 20 of the requested admissions is concerned, the cited decision by the Federal Court of Justice (BGHZ 10, 340) is not a Max Stern case and concerns a completely different legal problem than the defendant alleges. First of all Dr. Max Stern cannot be bound by a judgment of the Federal Court of Justice he was not party to. Secondly, the cited judgment of the Federal Court of Justice deals with the specialty of Allied restitution law to the German Civil Code in regard to the question, which judicial codex should be applied when legally qualifying transactions between 1933 and 1945 in connection with claims for restitution in kind. I referred to this problem above (see point 8) of my declaration. The decision of the Federal Court of Justice (BGHZ 10, 340 (343)) does simply not state "that the payment of (awarded) compensation excludes any subsequent of annulment of an unlawful shift of property..." etc. - nor does it make any reference to the Federal Compensation Law in that regard (it is not even clear what the defendant refers to by speaking of the "Federal Indemnification Law"). Those references the defendant alleges are factually false. I might want to add that the cited judgment of the Federal Court of Justice was made on October 8th 1953, the first version of the Federal Compensation Law (then still called Bundesergänzungsgesetz) was only issued on September 18th 1953 and could therefore hardly have been subject of a decision by the Federal Court of Justice already. The version of the

---

[19] BGH RzW 1956, 335.

Federal Compensation Law Dr. Max Stern based his claim for dissipation damage on (then called Bundesentschädigungsgesetz) was issued in 1956 only, hence three years later.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 8th, 2007

DR. ULF BISCHOF
Bischof & Paetow
Rechtsanwälte in Partnerschaft
Schwedter Straße 9A
10119 Berlin
Deutschland
Germany
Telephone: 011 49 (0)30 40 50 58-0
Facsimile: 011 49 (0)30 40 50 58-10

## CERTIFICATE OF SERVICE

I the undersigned hereby certify that on June 18, 2007, the foregoing was served by first-class U.S. mail, postage prepaid, and by certified mail on:

Maria-Louise Bissonnette
59 Park Row W
Apt. 905
Providence, RI 02903

*/s/ Miranda Perkins*