APPENDIX 3

UNITED STATES COURT OF RESTITUTION APPEALS
OF THE
ALLIED HIGH COMMISSION FOR GERMANY

# REPORTS

Opinions Nos. 61 — 180

Memorandum Opinions Nos. 1 — 200

Advisory Opinion No. 2

---

US HICOG Law No. 21

Amendments to US MG Law No. 59

---

Entscheidungen Nr. 61 — 180

Summarische Entscheidungen Nr. 1 — 200

Rechtsgutachten Nr. 2

---

US HICOG Gesetz Nr. 21

Änderungen des MR Gesetzes Nr. 59

Kammergericht zu Berlin

U.S. COURT OF RESTITUTION APPEALS of the Allied High Commission for Germany

VOLUME II

1952

Copyright 1952, by US High Commission for Germany

Bibliothek des Kammergerichts
Zugangsverzeichnis Abt. II No. 26705-2-

**ERWIN JULIUS KOPPEL**, Claimant-Appellant,

vs

1. **DR. FRITZ ETTLINGER,**
2. **WALTER BRUEGGEMANN,**
3. **HERMANN BRUEGGEMANN,**
4. **DR. ERICH HAASIS,**
5. **MARGARETE HAASIS,**
6. **WERNER BRUEGGEMANN,**
7. **PAUL BRUEGGEMANN,**

Restitutor-Appellees.

Opinion No. 164 Filed with the Clerk: 11 January 1952 Case No. 116

Appeal from the decision of the Oberlandesgericht at Frankfurt/Main.

Attorneys-at-Law Dr. W. Lewald, Frankfurt, and Dr. E. J. Cohn, London, for the Appellant.

Attorney-at-Law Dr. Werner Rhode, Frankfurt, for Dr. Fritz Ettlinger, Appellee.

Attorney-at-Law Hans Eigel, Frankfurt, for the Appellees 2) to 6).

Attorney-at-Law Dr. Rudolf Paul, Frankfurt, for Paul Brueggemann, Appellee.

Before Justice COHN, President, Justice FLANAGAN, and Judge TURMO, sitting as a Justice.

The Opinion of the Court was delivered by COHN, President.

The Jewish claimant, in 1929, purchased the firm of Hesse Rubber Goods Manufactory Fritz Peter located at Klein-Auheim, which had discontinued production and was in liquidation. He acquired the same with a capital of RM 50,000 and established the Hesse Rubber Goods Manufactory Fritz Peter A.G., Klein-Auheim. The claimant entered into a composition with the creditors and re-financed the heavy indebtedness against the company. He raised the original capital stock from RM 50,000 to RM 400,000 about three weeks after he founded the new company. The capital stock was divided into four hundred bearer shares each with a face value of RM 1,000. The company was engaged in producing bicycle tires and rubber balls for children. Despite lack of capital, heavy indebtednesses, competition and the economic depression, the claimant caused the business to have a good measure of success.

On 9 June 1933, the claimant sold half of the stock, two hundred shares, to Dr. Fritz Ettlinger who was an attorney-at-law and Notary Public at Frankfurt. However, he was prevented from practicing his profession as a notary under the discriminatory law against Jewish lawyers of 7 April 1933, Reichsgesetzblatt I, Page 188, in conjunction with the Law for the Re-Establishment of the Civil Service of that same date, Reichsgesetzblatt I,



Page 175. Under the burden of these laws he sought a way to earn a livelihood. He negotiated with the claimant. One alleges that the other approached him and the other claims the other offered to sell him the shares. This is immaterial for our conclusion. The sales price was RM245,000 i.e. 122½ per cent of the face value of the shares. RM 155,000 of this sum were payable in instalments in Germany, all of which were paid except an instalment of RM 46,000 due in 1937. The balance of RM 90,000 under the terms of the agreement were paid to the claimant in Switzerland in Swiss francs in the total of SFrs 120,000. This payment in Swiss currency was of prime importance to the claimant. This stipulation of the contract was performed by Ettlinger with the assistance of his brother who resided abroad. The claimant, though emigrating earlier, remained under an employment contract with the company until 1937. Soon after the purchase of the shares, Ettlinger greatly assisted the financial structure of the company by becoming personally liable for the debts of the company which involved a risk of some RM 1,000,000.

The claimant asserted that he was entitled to the presumption of confiscation under Article 3, Law 59. He was, as a Jew, a member of the class of persons set forth in Article 1, Law 59, which was to be eliminated in its entirety from the cultural and economic life of Germany by measures taken by the state or the NSDAP; that a fair purchase price had not been paid and that he was denied the free right of disposal of the purchase price received because he was a Jew; that he realized immediately upon the seizure of power by the Nazis that he was in a precarious position and would have to prepare to leave Germany and that the rubber manufactory suffered because of Nazi action. He demanded from Ettlinger the two hundred shares sold plus all profits from the shares and any profits from the later sale, which will be treated later herein, to the restitutors, meaning to obtain from the other restitutors the said two hundred shares sold to them by Ettlinger.

Ettlinger countered with the defenses that not only was the price paid fair, but that the shares were not worth what he had paid for them and that he, not the claimant, was under personal duress at the time. It is impossible for a Jew to have confiscated property from another Jew.

The claimant contended below and before us that Ettlinger had agreed to establish a rubber company branch in Palestine to insure his, Koppel's subsistence abroad and that he had failed to do so in accordance with his agreement and was therefore disloyal to him and should be denied any rights in attempting to set up a defense to the presumption of confiscation.

The Restitution Chamber denied the claim against Ettlinger and this decision was appealed to the Oberlandesgericht, which reversed the Chamber and ordered a new trial.

The doctrine of estoppel may well be applied under Article 3, Law 59, either in behalf of a claimant or a restitutor. In the case at bar we have examined the nearly 200 pages of briefs, motions and affidavits filed by the claimant and we fail to find anywhere that the original agreement entered into between Koppel and Ettlinger for the sale of the two hundred shares had in any of its elements the establishment of a branch rubber manufactory in Palestine. It might well be that such an agreement was

entered into between those two men. It might be that Koppel has a claim against Ettlinger for breach of the alleged contract. However, that could not be an issue in this restitution proceeding. It is far remote from the transaction entered into between the parties in this instance.

We can not agree with the averments made by the claimant-appellant or the Oberlandesgericht when it states that the trial court did not find whether or not the sales price paid to the claimant was adequate. A perusal of the record shows that upon substantial evidence the Chamber found the following:

"Besides, the sales price paid to the claimant was adequate. Even if the Swiss Francs 120,000 which were actually paid in Basel are only rated at the official stock exchange rate, the sales price amounted to an exchange rate of 125 per cent. The sales price appears as absolutely adequate, and even as very good, in consideration of the figures shown by the balance accounts of the time, and primarily in consideration of the extraordinary encumbrance of the company with short-term debts which exceeded the stock capital by far, and also in view of the heavy risk—mentioned by the claimant himself—which was combined with Ettlinger joining the company and which would even have existed if Ettlinger had been an 'Aryan'. Moreover, the claimant had the free power to dispose of the sales price. In the first place, this applies to the Swiss Francs 120,000 paid in foreign currency in Basel, which the claimant himself called the part of the business which he considered as the most important one. However, this also applies to the rest of the sales price paid in Reichsmark in Germany. The claimant did not leave Germany until 1936. Under Law No. 59, the free power of disposal is not tantamount to a transfer. As regards the claimant's free power of disposal in Germany, it was not restricted until a considerable time, namely three years, later for which fact Ettlinger is not responsible. No further words should be needed to emphasize that the claimant is not entitled to plead in restitution proceedings that the sales contract concluded with Ettlinger is invalid under Article 134, Civil Code, because of a violation of the German provisions on the control of foreign exchange, circumvented in his own interests."

Contrary to the contention, Law 59 does not define the status of the transferee in a transaction with a persecutee under the aforesaid Article 3. It is entirely possible for a Jew or any other persecutee to be the restitutor.

There is not a scintilla of valid evidence in the cause which would show that Koppel relinquished the shares to Ettlinger because of any factors proving an act of confiscation within the meaning of Article 2, Law 59. It is conclusively proven that the buyer paid a fair purchase price and the transferor was not denied the free right of disposal thereof on any of the grounds set forth in Article 1, Law 59. The presumption of confiscation has been successfully rebutted (Article 3, Paragraph 2, Law 59).

As to this issue of the litigation the Oberlandesgericht is reversed and the decision of the Chamber denying restitution is affirmed. This precludes further consideration of the claimant's demand for the shares conveyed by Ettlinger to the other restitutors.

---

Comes now the second alleged confiscation in the instant cause. The request for relief by Koppel against the restitutors numbered 2–7 in the caption hereof is an entirely different story.

The claimant has appealed to us from the decision of the Oberlandesgericht which set aside the Chamber's decision ordering the restitutors



under 2–7 to return the claimant's shares of the Hesse Rubber Goods Manufactory Fritz Peter A.G., Klein-Auheim, in the face value of RM 200,000 for a simultaneous payment of DM 46,900 and reinstating the claimant to the board of directors of the company.

Under a sales contract of 16 September 1937, Koppel and Ettlinger sold all of their shares in the company to the other parties to this litigation for a price of RM 720,000 of which RM 235,000 was to be paid by the purchasers from the funds of the enterprise to settle the employment contracts with the company and the sellers and their salaries and dividends due. Of the sales price, RM 333,500 was paid into the vendor's blocked emigration account at the Offenbach/Main Branch of the Dresdner Bank. RM 37,000 of the blocked account was entered in behalf of the Frankfurt/Main Tax Office and on behalf of the Darmstadt Tax Office, Office for Foreign Exchange Control. Payment of the remaining RM 18,000 was refused by the restitutors 2–7. The Chamber found on substantial evidence that the claimant was enabled to transfer out of the blocked emigrant's account Reichsmark converted into English Pounds in the amount of 2,343.6.9.

All of the property of the claimant was seized by the government on 22 December 1938, by an announcement published in the Reich Gazette No. 298 and it was declared confiscated on behalf of the German Reich on 2 November 1939, Reich Gazette No. 258. The trial court found that the claimant lost at least RM 230,000 by the imposition of the Capital Flight Tax, the Tax on Jewish Property, income tax, smaller taxes and by reason of the confiscation of his remaining property.

The Chamber found upon irrefutable proof that the transaction would not have taken place in the absence of National Socalism (Article 4, Law 59). Therefore, it was unnesessary for the Chamber to ascertain whether or not a fair purchase price was paid by the purchasers of Koppel's shares. It is also absolutely proven that Koppel did not receive all of the purchase price at his free disposal because of his race and because as a Jew he was forced to flee the Reich. The restitutors averred that they had assisted Koppel in protecting his property interest in an unusual manner and with substantial success (Article 4, Paragraph 1 b, Law 59), in that they had helped him transfer his assets abroad. This was based in the main in that they alleged that they had been instrumental in obtaining permission to have the purchase price paid into Koppel's blocked emigration account. At the time of the sale this was usual procedure in Germany for funds of Jews who had been forced to flee the Reich or who were about to depart the Reich because of duress. Approvals of sales at that time usually carried the provision that the sales price was to be paid into a blocked emigration account under the absolute control of the Foreign Exchange Control Office. We see nothing unusual about that nor did the trial court. The restitutors 2–7 have failed to successfully rebut the power of avoidance given to the claimant under Article 4, supra.

The further defense that Koppel was no longer under duress because he had already removed himself from Germany and that the contract was executed in Switzerland is also untenable. This proposition has been firmly established by restitution courts. Even though a persecutee had obtained personal asylum, the duress against him was not completed until his

property in Germany had been confiscated. When such was done the place of residence of the loser is immaterial. He was deprived of his property because of one of the reasons set forth in Article 1 (Maffei et als vs Drey et als, C/RA Opinion No. 74).

In 1940, the capital stock in the company was increased by RM 200,000, which was issued to the restitutors 2–7. The shares were not negotiated in the open market. They were bearer instruments as defined in Article 21, Paragraph 3 and especially subsections (a) and (b) and (c) apply in that the company was an enterprise with a small number of members. Article 22, Law 59, is quoted:

"Restitution in Event of Changes in the Legal or Financial Structure of an Enterprise.

If a participation of the type described in Article 21, Paragraph 3, had been confiscated and if the enterprise had been dissolved or merged into, or consolidated with, or transformed into another enterprise, or had been changed in any other way in its legal or financial structure, or if its assets had been transferred wholly or in part to another enterprise, the claimant may demand that he be given an appropriate share in the modified or newly formed enterprise or in the enterprise which had acquired wholly or in part the assets of the original enterprise, thereby restoring as far as possible this original participation and the rights incident thereto."

The financial structure had been modified by the increase in capital stock. The Chamber misunderstood the legal principles involved when it awarded the one hundred shares to the restitutors for their success in managing the concern, even though it recognized the applicability of said Article 22. The Chamber shall retry this issue. An appropriate share in a modified company means the percentage of stock which the claimant held in the company before the change in the financial structure. Though in many instances adequate compensation must be paid for the additional stock participation. If the Chamber finds the claimant entitled to have his original participation restored, it must determine the following: Whether or not the new shares were issued because of the capital worth of the company, as representing profits, or if new money was paid to the corporation for them. If the new shares were issued without compensation paid to the company the claimant would be entitled to one hundred of the new bearer shares without payment. For then the shares would only represent funds of or profits of the enterprise itself. If the restitutors 2–7 actually paid for the shares, it is incumbent upon the trial court to fix the amount, which must be paid by the claimant to the restitutors for the one hundred shares if they were purchased from the company with personal funds. These too, must not have been derived from the dividends which Koppel's original shares earned.—The enforcement of the principles set forth in Article 22, must be done in accordance with Article 23, Law 59.

The Chamber found upon conclusive proof that the conversion of marks from the blocked account into English Pounds received by the claimant was in the sum of RM 30,000. This is uncontroverted in the proof. The Chamber erroneously converted the RM 30,000 into DM 30,000. We have repeatedly held, starting with the decision in Keck vs Meinfelder, C/RA Opinion No. 58, that under Article 44, Law 59, the purchase price to be refunded by the claimant is in kind, meaning the specie the restitutor actually paid for the property. In this case it is Reichsmark. So, the



conversion of the money received at free disposal must be DM 3,000 plus interest. We leave the questions as to whether or not other sums were obtained at free disposal by the claimant and as to the amount of profits drawn by the restitutors which should be credited to the claimant for the Chamber's determination.

We set aside the decision of the Oberlandesgericht.

We affirm the Chamber's decision only in so far as it orders the restitution of two hundred shares of the stock of the company and the allowance of participation of the claimant on the board of directors of the corporation. We set aside the order of the Chamber in so far as it limits restitution to two hundred shares and in so far as it orders the claimant to pay the sum of DM 46,900 upon return of the said two hundred shares.

We order that the restitutors 2–7, as joint debtors, restore to the claimant two hundred shares of the original capital stock of the Hesse Rubber Goods Manufactory Fritz Peter A.G., Klein-Auheim. Execution shall issue by the Chamber forthwith upon the claimant depositing security with the Chamber in the sum of DM 15,000 guaranteeing the payment of any sum the Chamber properly finds due the restitutors from the claimant.

We further order that the Chamber adjudicate the rights of the claimant in and to one hundred shares of the subsequently issued shares of the said company and what amount, if any, the claimant should pay for the same if they are awarded to him. Also, in that event, whether or not the claimant is entitled to the profits drawn from the said one hundred shares.

It is incumbent upon the Chamber to retry the issue of monetary adjustments between the parties within the purview of Article 32, Law 59.

The claimant must assign to the restitutors 2–7 his claim for indemnification of the money paid by the said restitutors and not obtained by Koppel at his free disposal.

The cause is remanded to the Restitution Chamber for a retrial in accordance with this opinion.

No costs are charged for the proceedings before this Court; the parties shall bear their own costs, fees and expenses.

IT IS SO ORDERED: