IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MAX STERN ESTATE | : | |
| | : | Civil Action No: 06-211ML |
| v. | : | |
| | : | |
| MARIA LOUISE BISSONNETTE | : | |

**DEFENDANT, MARIA LOUISE BISSONNETTE'S OPPOSITION TO PLAINTIFF, MAX STERN ESTATE'S STATEMENT OF UNDISPUTED FACTS AND ADDITIONAL STATEMENT OF DISPUTED FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT**

Now comes Defendant, Maria Louise Bissonnette ("Mrs. Bissonnette"), pursuant to Local Civ. R. 56, and submits this Opposition to Plaintiff, Max Stern Estate's Statement of Undisputed Facts and Additional Statement of Disputed Facts that precludes entry of Summary Judgment.

Mrs. Bissonnette agrees that the following statements are undisputed: Paragraphs Numbered 1 through 38, 41, 42, 44, 45, 46, 47, 49, 50, 53, 54, 59, and 60.

**Stern's Efforts to Recover his Collection**

39. **Plaintiff's Statement**: After the end of World War II, Stern made many efforts to find and recover his collection. *See generally Concordia University press release, "Concordia Announces the Return of an Important French Painting Lost to Max Stern During the Nazi Regime,"* Oct. 19, 2006, at SE01351 *(Vineberg Dec. Ex. 10).* Immediately after the War, he pursued and recovered paintings through the Canadian Military Mission (Letter from Undersecretary of State for External Affairs Canada to Stern, March 3, 1948 (Vineberg Dec. Ex.

16)) and pursued further recoveries through the British military government for the British zone of occupation in post-War Germany, which zone included Dusseldorf and Cologne (Claim form by Max Stern, dated December 27, 1948 (Vineberg Dec. Ex. 12)). He also advertised several of his losses in the magazine Canadian Art. "A Search for Lost Paintings," Canadian Art (Christmas 1948), at 90-91 (Vineberg Dec. Ex. 14). He also placed an advertisement in Die Weltkunst on August 1, 1952 (Vineberg Dec. Ex. 18). In 1949, Stern visited Europe with his wife in an attempt to trace his lost paintings. Letter from Secretary of State for External Affairs Canada to Dore, Canadian Ambassador to Belgium, dated May 3, 1949 (Vineberg Dec. Ex. 17).

**Defendant's Response**: In plaintiff's own exhibits, referenced in their assertion above, there is absolutely no mention of the painting at issue in this matter. Specifically, Defendant cites a magazine article entitled "A Search for Lost Paintings" which is appended to Plaintiff's Declaration of Robert S. Vineberg at Exhibit 14, bates number SE01679 andSE01680. The language contained in the article indicates that Mr. Stern sought "nine paintings" which were lost in Europe during the war. The article goes on to state that the paintings depicted in the accompanying illustration at SE01680 were the "most important" of his lost collection. The painting at issue in this matter is neither listed nor depicted. Additionally, Plaintiff's statement indicates that Mr. Stern placed an advertisement in Die Weltkunst on August 1, 1952. Again, there is no mention of the Winterhalter painting. As such, any effort to argue that the advertising efforts in the Canadian and German magazines rises to the level of due diligence to find the Winterhalter painting is disingenuous.

40. **Plaintiff's Statement**: Later, Dr. Stern initiated proceedings in Germany for the recovery of paintings and other property seized by the Gestapo. Claim form by Dr. Max Stern, dated Feb. 28, 1958 (Vineberg Dec. Ex. 13). He also pursued claims for monetary compensation

for his art losses through the German restitution courts in the early 1960s. Stern v. Land Nordrhein-Westfalen (Vineberg Dec. Ex. 15).

**Defendant's Response**: In the translated documents provided by Plaintiff's counsel and referenced in paragraph 40, specifically, Exhibit 13 of the Vineberg Declaration, Mr. Stern indicated that the property that he sought recompense for was lost in 1939-1940. The painting at issue in this matter was sold at auction in 1937 (Plaintiff's Exhibit, Vineberg Dec. Ex. 13 at SE00414a). However, more importantly, there is no mention of the painting at issue in either of Mr. Stern's inventories of paintings that he was dispossessed of as a victim of Nazi war crimes. (See, Plaintiff's Exhibit, Vineberg Dec. Ex. 12, bates numbers SE 00279a, SE00280a, SE00281a). Also, important to note, there is no attachment to Plaintiff's Exhibit, Vineberg Dec. Ex. 13 that lists any paintings at all. It was not until 1962 that the Winterhalter painting appeared on a listing of Mr. Stern's lost art. That list, provided in Plaintiff's Affidavit of Steven Fusco, Exhibit F, appears to be prepared by or for Mr. Stern's expert, Josef Pfeiffer, in Stern v. Land Nordhrhein-Westfalen. As such, nearly a quarter century had passed before the Winterhalter painting was sought by Mr. Stern. Moreover, there is no indication from Plaintiff's counsel that Mr. Stern or his survivors actively sought the painting in the intervening years until it was located in Cranston, Rhode Island in 2003. There are no references to advertising, claims processing, or travelling to Europe in these latter years to search for this lost painting.

43. **Plaintiff's Statement**: On or about February 24, 1964, a restitution court in Germany recognized that the Lempertz/Stern sale was a forced sale. Stern v. Landnordrhein-Westfalen at 7-8 (Vineberg Dec. Ex. 15). The court also recognized that the paintings sold at the Lempertz/Stern sale were owned by Dr. Stern.

**Defendant's Response**: The decision of the restitution court involved compensation to Mr. Stern for loss due to dissipation in the circumstances surrounding the sale of the paintings that were auctioned at the Lempertz/Stern sale. There is no indication in the decision that the restitution court believed that Mr. Stern was still the true owner of these paintings.

**Stern Estate's Discovery of the Painting**

48. **Plaintiff's Statement**: In the Consignment Contract, Bissonnette certified as follows:

I CERTIFY, that I am the owner and/or legal representative of the above listed goods, merchandise, and/or property and have good title and the right to sell and that they are free from all incumberances. I agree to accept all responsibility for providing merchantable title and for delivery of title to purchaser . . . .

Plaintiff's Exhibit, Consignment Contract at 1 (Fusco Affidavit, Exhibit A).

**Defendant's Response**: At the time that Mrs. Bissonnette certified this contract by signing, she had no notice or knowledge of any potential cloud on the title of the painting that she had inherited from her mother, Baroness von Morsey Pickard in 1991. Defendant Maria-Louise Bissonnette's Affidavit in Support of her 12(b) Motion to Dismiss and/or for Stay, ¶ 5.

51. **Plaintiff's Statement**: Estates Unlimited provided Bissonnette's identity and contact information to ALR, and informed Bissonnette of Stern Estate's claim. Fusco Aff. ¶ 8. Upon receiving information from Estates Unlimited about the claim, Bissonnette told Estates Unlimited that it was "ridiculous" and "impossible."

**Defendant's Response**: Mrs. Bissonnette's complete response to Mr. Fusco of Estates Unlimited was that is was "ridiculous" and "impossible" because her step-father had purchased the painting at auction and that she had a receipt for it. Fusco Aff. ¶ 8. The statement above was presented by Plaintiff in truncated form.

52. **Plaintiff's Statement**: In January 2005, Stern Estate made a claim for restitution of the Painting with the Holocaust Claims Processing Office in New York ("HCPO") of the State of New York Banking Department. Email from Korte, on behalf of Stern Estate, to Art Loss Register, January 6, 2005 (Fusco Aff. Ex. D); Rubin Dec. ¶ 3; Letter from Cohen to Bissonnette, Feb. 8, 2005 (at SE0075-78) (Rubin Dec. Ex. A).

**Defendant's Response**: Upon information and belief, the Holocaust Claims Processing Office was established in 1999 by then-Governor George Pataki of New York, in an effort to assist individuals in recovering, inter alia, lost, stolen or looted art. Any due diligence analysis demands that this Court determine whether Mr. Stern or any individuals acting on his behalf should have listed this painting with the HCPO before January 2005.

55. **Plaintiff's Statement**: From February 2005 through April 2006, HCPO and Bissonnette continued a dialogue in an attempt to resolve Stern Estate's restitution claim. Compl. ¶ 42; Bissonnette Ans. ¶ 41; Rubin Dec. ¶ 7.

**Defendant's Response**: While there were settlement negotiations between the parties, offers that were made to Mrs. Bissonnette were significantly below the fair market value of the painting. Kline Dec. Exhibit 3, Letter from Attorney Scott Buckley to Attorney Sherri North Cohen, Esquire.

56. **Plaintiff's Statement**: On or about April 19, 2006, Stern Estate learned that the painting had been removed from this District and the United States, and sent to Germany. U.S. Postal Service, Customs Declaration and Dispatch Note, dated September 15, 2006 (Kline S.J. Dec. Ex. 4); Rubin Dec. ¶ 7; letter from Cohen to Weltman, March 30, 2006 and attached Press Release dated Mar. 23, 2006 (Rubin Dec. Ex. C).

**Defendant's Response**: Counsel for the Estate of Max Stern was notified by Mrs. Bissonnette's former counsel, Attorney Scott Buckley, that the painting had been sent to Germany due to the institution of an action in German Courts to definitively determine title to the painting. (Kline S.J. Dec. Ex. 1). At the time the painting was sent to Germany, there was no court action pending in this District, or in any other court in the United States.

57. **Plaintiff's Statement**: The Court has directed Bissonnette to refrain from moving the painting without first obtaining the prior permission of this Court. Order, June 12, 2007.

**Defendant's Response**: Mrs. Bissonnette was not under any court order at the time she moved the painting. Since the Order entered by this Honorable Court on June 12, 2007, Ms. Bissonnette was brought back to court on Plaintiff's Motion for Conditional Order of Contempt. That dispute, which is well known to this Court, was resolved amicably by the parties. At no time has there been any assertion by Plaintiff that the painting has been moved again. It is currently under the care, custody and control of Mrs. Bissonnette's German counsel who have been advised by Mrs. Bissonnette's American counsel of their duty to cooperate fully with any viewing of the painting by Plaintiff's expert(s) or assistants.

58. **Plaintiff's Statement**: After the painting arrived in Germany, Bissonnette obtained an appraisal of the painting from the Lempertz auction house in the range of 50,000 to 70,000 Euros (approximately $67,000 to $94,000) (Legal Action at 10, attachment to Bissonnette's Section 12(b) Afff.). Also, Bissonnette attempted to sell the painting through Lempertz. Letters from Strasaldo to Rosshoff, dated Aug. 9 and 16, 2006, Ex. 6).

**Defendant's Response:** In the Exhibit referenced by Plaintiffs, there are two letters, one in German and written on "Kunsthaus Lempertz" letterhead, signed by Dr. Alexander Graf

Strasaldo (Kline S.J. Dec. Ex. 7) and another, written (or possibly, translated) in English. The letter appearing in English bears a date of August 16, 2006. There is nothing in the letter that indicates that Mrs. Bissonnette solicited any representative of the Lempertz auction house to sell the painting for her. It is extremely difficult to countenance the notion, and troubling to contemplate that a representative of the Lempertz gallery, the locus of the 1937 Stern auction, would be interested in assisting in the sale of a painting with a questionable provenance.

**DEFENDANTS STATEMENT OF UNDISPUTED FACTS**

1. Despite Plaintiff's assertions to the contrary, some evidence of the transactions at the Lempertz survived the war. In point of fact, a representative of the Lempertz gallery provided a statement to the German Reparations Court that considered Mr. Stern's claims in the early 1960s. These statements were relied upon by the German court in their calculus to determine the amount of dissipation which resulted from the auction of the paintings. Specifically, the Court wrote, "The owner of the art house Lempertz communicated in his letter of August 4, 1961 (page 213 compensation file) that the individual paintings were auctioned at regular prices. Therefore, there is no indication of dissipation, particularly since the plaintiff set minimum prices for every item, below which nothing was sold." (Plaintiff's Exhibit, Vineberg Dec., Exhibit 15, bates number SE00553). This statement is not presented to the Court to argue that Mr. Stern's paintings were sold for a fair price, rather, it is advanced to show that there must have been some documentation in existence for this representative to have relied upon in making such a statement.

2. A document prepared by the faculty of Concordia University, one of the beneficiaries of the Max Stern Estate, described Mr. Stern's business practices as follows:

"Dr. Stern was as implicated as anyone else in the uneven provenance practices of his profession. Over and over again when reading the Lempertz catalogue, one asks, 'from whom was the painting purchased?' Having such information at hand could help track the circulation of works of art for which knowledge of the 1937 Stern possession has either been lost or suppressed. Stern was silent on the sources of most of his nineteenth and early twentieth century holdings . . . For those now seeking the return of the Galerie Stern's final stock, its owner thus has failed to be of much assistance."

(Vineberg Dec. Exhibit 8, bates number SE01382).

Moreover, there is language in the same publication that seems to indicate that Mr. Stern may have, himself, profited from the forced sales of the Nazis. Specifically, Defendant references the following statement:

"Stern's provenance habits have consequences for more than the locating of the Auktion 392 art. In Die Bestande, Stern noted that a portrait of an English-woman by the eighteenth-century British artist Ozias Humphrey previously had been in the possession of A.S. Drey, a well-known art dealership in Munich. No date was given for the transfer—one more instance of spotty provenance, one more lost opportunity for a tracking aid. If, however, the painting was purchased out of the 1936 A.S. Drey sale, a new factor is introduced. The firm was compelled to auction off many of its holdings that year because it had received what recently has been interpreted as an extortionate tax bill from the National Socialist government, with several works of art being returned to descendants of the Drey owners as a result. Reclaiming the Humphrey painting—once it is located—may entail adjudication on the principle of 'first loss,' as will efforts to seek restitution of any Auktion 392 work of art which, knowingly or unknowingly, has been purchased by Stern from those 'under duress' from the Nazis."

Id. at bates number SE01383.

3. Specifically, the Catalogue produced by the Plaintiff in the Vineberg Dec. Exhibit 8, bates number SE01410 states as follows:

"While Winterhalter (1805-1875), who was born in Menenschwand in the Black Forest and spent much of his life in Paris, was not an artist closely identified with the Galerie Stern, the presence of this work at the Cologne event was clearly considered of importance. It was the first illustration in the catalogue, which unfortunately was silent of the issue of provenance and did not suggest a date."

As such, Mr. Stern did not indicate from where, or from whom, he received the painting. There is nothing that indicates that had good title for it. This is plaintiff's burden to prove. The

periodical definitely indicates that Mr. Stern was not a meticulous keeper of documents concerning the origins of his artwork. Also, it must be noted that during this climate of fear and persecution, many art dealers, or private individuals for that matter, may have wanted to cover their tracks. However, that being said, if Mr. Stern's representatives are unable to trace the painting at issue in this matter directly to Mr. Stern's ownership, Mrs. Bissonnette should not be wrongly deprived of her property.

Respectfully Submitted,
Maria Louise Bissonnette,
By her Attorneys,

/s/ David A. Levy, Esquire
/s/ Marta E. Garrett, Esquire
David A. Levy, Esquire (Bar Number 4564)
Marta E. Garrett, Esquire (Bar Number 7130)
326 Park Row West, #326
Providence, Rhode Island 02903
(401) 952-0033
(401) 274-5562

**CERTIFICATION**

I, Marta E. Garrett, Esquire, hereby certify that on this 31 day of July, 2007, that I caused a true copy of the within Opposition to Plaintiff's Statement of Undisputed Facts to the following counsel of record, via the ECF system: Thomas R. Kline, Esquire and L. Eden Burgess, Esquire 1350 I Street, NW, Suite 1100, Washington D.C. 20005 and Samuel Zurier, Esquire, TILLINGHAST LICHT LLP, 10 Weybosset Street, Providence, Rhode Island 02903.

/s/ Marta E. Garrett_____________