**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| Stern Estate,<br><br>Plaintiff,<br><br>v.<br><br>Maria-Louise Bissonnette, *et al.*<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Act. No. 06-211 (ML)** |

**STERN ESTATE'S REPLY TO DEFENDANT'S ADDITIONAL STATEMENT OF DISPUTED FACTS THAT PRECLUDE ENTRY OF SUMMARY JUDGMENT**

Pursuant to LR Cv 56, the Dr. and Mrs. Max Stern Foundation ("Stern Estate" or "Plaintiff"), through its trustees, hereby replies to Defendant Maria-Louise Bissonnette's ("Bissonnette" or "Defendant") Opposition to Stern Estate's Statement of Undisputed Facts and Additional Statement of Disputed Facts that Preclude Entry of Summary Judgment ("Bissonnette Stmt of Facts").

**Bissonnette's Statement of Fact No. 1**

1. Despite Plaintiff's assertions to the contrary, some evidence of the transactions at the Lempertz [auction house] survived the war. In point of fact, a representative of the Lempertz gallery provided a statement to the German Reparations Court that considered Mr. Stern's claims in the early 1960s. These statements were relied upon by the German Court in their calculus to determine the amount of dissipation which resulted from the auction of the paintings. Specifically, the Court wrote, "The owner of the art house Lempertz communicated in his letter of August 4, 1961 (page 213 compensation file) that the individual paintings were auctioned off at regular prices. Therefore, there is no indication of dissipation, particularly since the plaintiff set minimum prices for every item, below which nothing was sold." (Plaintiff's Exhibit,

Vineberg Dec., Exhibit 15, bates number SE00553). This statement is not presented to the Court to argue that Mr. Stern's paintings were sold for a fair price, rather, it is advanced to show that there must have been some documentation in existence for this representative to have relied upon in making such a statement.

**Plaintiff's Response to Bissonnette's Statement of Fact No. 1**

Defendant's claims that (1) "some evidence of the transactions at the Lempertz survived the war" and (2) "there must have been some documentation in existence for this representative [of Lempertz] to have relied upon in" stating that the Stern paintings were auctioned for a fair price are based on pure speculation, and are not based on and do not constitute admissible evidence.

The German Court decision that Defendant relies upon cites no Lempertz documents that survived the War. *Stern v. Land Nordrhein-Westfalen* (*Vineberg Dec.* Ex. 15). In connection with its Motion for Summary Judgment, Plaintiff asserted and Defendant admits that "[Lempertz's] Nazi-era records were destroyed" by World War II bombing. *Stern Estate's Statement of Undisputed Facts in Support of its Motion for Summary Judgment* ("Stern Estate Stmt of Facts") ¶ 42; *Bissonnette Stmt of Facts* at 1; *Excerpt from Lempertz website*, at SE001246 (*Kline S.J. Dec.* Ex. 1). Defendant does not indicate how, in the face of that destruction, any relevant records not presently before the Court could have survived. Nor does she explain what Lempertz documents she believes survived the War, where they can presently be found, why she has failed to provide them to Plaintiff or the Court, or how she believes they impact the evidence and arguments presently before the Court. All federal discovery tools were available to Defendant Bissonnette and now, with discovery closed, her bald assertion that there

"must have been" additional documents is not a fact, does not cast doubt on Plaintiff's evidence and does not create a factual issue for trial.

**Bissonnette's Statement of Fact No. 2**

2. A document prepared by the faculty of Concordia University, one of the beneficiaries of the Max Stern Estate, described Mr. Stern's business practices as follows:

> "Dr. Stern was as implicated as anyone else in the uneven provenance practices of his profession. Over and over again when reading the Lempertz catalogue, one asks, 'from whom was the painting purchased?' Having such information at hand could help track the circulation of works of art for which knowledge of the 1937 Stern possession has either been lost or suppressed. Stern was silent on the sources of most of his nineteenth and early twentieth century holdings. . . . For those now seeking the return of the Galerie Stern's final stock, its owner thus failed to be of much assistance."

(Vineberg Dec. Exhibit 8, bates number SE01382).

Moreover, there is language in the same publication that seems to indicate that Mr. Stern may have, himself, profited from the forced sale of the Nazis. Specifically, Defendant references the following statement:

> "Stern's provenance habits have consequences for more than the locating of the Auktion 392 art. In Die Bestande, Stern noted that a portrait of an English-woman by the eighteenth-century British artist Ozias Humphrey previously had been in the possession of A.S. Drey, a well-known art dealership in Munich. No date was given for the transfer—one more instance of spotty provenance, one more lost opportunity for a tracking aid. If, however, the painting was purchased out of the 1936 A.S. Drey sale, a new factor is introduced. The firm was compelled to auction off many of its holdings that year because it had received what recently has been interpreted as an extortionate tax bill from the National Socialist government, with several works of art being returned to descendants of the Drey owners as a result. Reclaiming the Humphrey painting—once it is located—may entail adjudication on the principle of 'first loss,' as will efforts to seek restitution of any Auktion 392 work of art which, knowingly or unknowingly, has been purchased by Stern from those 'under duress' from the Nazis."

Id. at bates number SE01383.

**Plaintiff's Response to Bissonnette's Statement of Fact No. 2**

Plaintiff does not deny that Dr. Stern's treatment of provenance appears to have been no better and no worse than the dealer practices of his times.

Also, Stern Estate recognizes the doctrine of "first loss," which dictates that if property is sold under force or duress by a persecuted person to a buyer who later sells the property under similar coercive circumstances, the person suffering the first deprivation remains the rightful owner whose claim is superior to that of the second persecuted person. Given the way National Socialist persecution progressed, becoming increasingly broader and more severe in its reach, such circumstances are not uncommon. Nonetheless, the claim of the second persecuted person would be superior to that of anyone else *other than the first persecuted person*. That Stern Estate recognizes the moral and legal force of the first loss doctrine does not provide *evidence* that Dr. Stern acquired any particular object – let alone the Painting – from a person who was then suffering from persecution. The Stern catalogue only notes that Dr. Stern, at some unknown time, acquired a different painting from A.S. Drey, who sold artwork under duress in 1936 before Dr. Stern received his final, unappealable order to liquidate his holdings; the catalogue does not connect any other artwork or the Painting to A.S. Drey, and only by speculating can one make that leap. *See Vineberg Dec*. Ex. 8, at SE01383. Nor is it relevant here, on a motion for summary judgment in a suit testing evidence of ownership and right to possession as between Bissonnette and Stern Estate, that there is a speculative possibility that A.S. Drey or some hypothetical person may have a claim superior to Stern Estate's.

**Bissonnette's Statement of Fact No. 3**

3. Specifically, the Catalogue produced by the Plaintiff in the Vineberg Dec. Exhibit 8, bates number SE01410 states as follows:

> "While Winterhalter (1805-1875), who was born in Menenschwand in the Black Forest and spent much of his life in Paris, was not an artist closely identified with the Galerie Stern, the presence of the work at the Cologne event was clearly considered of importance. It was the first illustration in the catalogue, which unfortunately was silent [on] the issue of provenance and did not suggest a date."

As such, Mr. Stern did not indicate from where, or from whom, he received the painting. There is nothing that indicated that [he] had good title for it. This is plaintiff's burden to prove. The periodical definitely indicated that Mr. Stern was not a meticulous keeper of documents concerning the origins of his artwork. Also, it must be noted that during this climate of fear and persecution, many art dealers, or private individuals for that matter, may have wanted to cover their tracks. However, that being said, if Mr. Stern's representatives are unable to trace the painting at issue directly to Mr. Stern's ownership, Mrs. Bissonnette should not be wrongfully deprived of her property.

**Plaintiff's Response to Bissonnette's Statement of Fact No. 3**

In the post-War compensation case that Dr. Stern brought against the German State of Nordrhein-Westfalen as a surrogate for the Federal Republic of Germany, the Court awarded him some compensation for his loss in profits from the Lempertz auction of the contents of his gallery, thus ruling that Dr. Stern owned the paintings sold at that auction. *Stern v. Land Nordrhein-Westfalen* (*Vineberg Dec.* Ex. 15). In its 1964 decision (*Vineberg Dec.* Ex. 15, at SE00552a), the German Court cited and relied upon a list of Dr. Stern's losses prepared in 1962, which includes the Painting (*see Fusco Aff.* Ex. F, at SE00536). By awarding Dr. Stern compensation for lost profits on the auctioned artworks as listed, the Court acknowledged that Dr. Stern was their owner and entitled to receive partial compensation. While this ruling is not binding on this Court, it provides *some evidence* that Dr. Stern owned the Painting.

Since Dr. Stern lost all the gallery records, it is true and unsurprising that he lacks information about how he acquired the Painting or its prior history. Bissonnette's Statement No.

3 does not dispute that Dr. Stern was in quiet possession of the Painting at the time National Socialist authorities in Germany ordered him to liquidate his gallery holdings, forcing him to sell the Painting at the Lempertz auction. Bissonnette provides only another "may have" statement in response to Plaintiff's evidence of the German Court's finding of ownership and the unquestioned proof of quiet possession, not her own *evidence* that Dr. Stern lacked title or possession.

Respectfully submitted:

*/s/ Thomas R. Kline*_____________
ANDREWS KURTH LLP
Thomas R. Kline (admitted *pro hac vice*)
thomaskline@andrewskurth.com
L. Eden Burgess (admitted *pro hac vice*)
edenburgess@andrewskurth.com
1350 I Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 662-2700
Facsimile: (202) 662-2739

*/s/ Samuel Zurier*__________
TILLINGHAST LICHT LLP
Samuel Zurier (R.I. Bar No. 3576)
szurier@tllaw.com
10 Weybosset Street
Providence, RI 02903-2818
Telephone: (401) 456-1200
Facsimile: (401) 456-1210

Dated: August 14, 2007

**CERTIFICATE OF SERVICE**

I the undersigned hereby certify that on August 14, 2007, the foregoing was served by email and by first-class U.S. mail, postage prepaid, on:

David A. Levy, Esq.
Marta E. Garrett, Esq.
50 Park Row West
Suite 326
Providence, RI 02903
Email: garrett@sbllp.net

*Counsel for Defendant*

/s/ Lauren Lewis___________



WAS:131051.1